William H. **SEVERNS**, Plaintiff,

v.

The **WILMINGTON MEDICAL CENTER, INCORPORATED**, a Corporation of the State of Delaware; **Richard S. Gebelein**, as Attorney General for the State of Delaware; **Martin Gibbs**, M. D., and the **Board of Medical Practice of the State of Delaware**, Defendants.

Supreme Court of Delaware.

Submitted April 18, 1980.

Decided Sept. 23, 1980.

---

Thomas Herlihy, III (argued), of Herlihy & Herlihy, Wilmington, for plaintiff.

William J. Wade (argued), of Richards, Layton & Finger, Wilmington, for defendant The Wilmington Medical Center, Inc.

Edward F. Kafader, Deputy Atty. Gen. (argued), Wilmington, for defendants Richard S. Gebelein, Atty. Gen. for the State of Delaware, and The Board of Medical Practice of the State of Delaware.

Martin Gibbs, M.D., pro se.

G. Thomas Sandbach (argued), Wilmington, for Mary Reeser Severns.

Before DUFFY, McNEILLY, QUILLEN and HORSEY, JJ., constituting the Court en banc.

DUFFY, Justice:

In this Certification proceeding the Court is asked to determine that the Court of Chancery has the power to order that certain life–sustaining supports for Mary Reeser Severns be removed. Implicitly, the complaint assumes that those supports sustain her life. The inevitable corollary is that, without them, Mrs. Severns will die. Thus the issue presented, no matter how it may be described, concerns actions which are expected to determine whether Mrs. Severns lives or dies.

I

Mrs. Severns, age 55, was the operator of an automobile which was involved in a one–car accident. She sustained serious injury to her brain which has significantly impaired its functioning. For all practical purposes, she has been in a coma since the accident occurred. Mrs. Severns was hospitalized at The Wilmington Medical Center after the accident and has remained there.

Her husband, William H. Severns (plaintiff) filed a complaint in the Court of Chancery for an order appointing him as guardian of her person.[1] The complaint names as defendants The Wilmington Medical Center, Dr. Martin Gibbs (the physician who attends Mrs. Severns), The Board of Medical Practice of the State of Delaware and the Attorney General. The Court of Chancery appointed G. Thomas Sandbach, Esquire, as attorney for Mrs. Severns. All defendants have appeared by counsel except Dr. Gibbs.

II

For present purposes, the parties have stipulated to certain facts which we repeat in some detail because they are helpful in placing the proceeding in context. The stipulation reads, in part, as follows:

"4. Shortly after her arrival at the Hospital, a tracheotomy was performed on Mrs. Severns by her treating neurosurgeon, Martin Gibbs, M.D. Mrs. Severns was connected to a respirator which in the beginning did the breathing for Mrs. Severns, and now assists her breathing. Drugs which helped maintain Mrs. Severns' blood pressure were administered to Mrs. Severns intravenously on December 18, 1979. Feeding was initially accomplished by intravenous methods and a catheter was put in place.

5. Since the time of her accident, Mrs. Severns has remained in a coma. The respirator remains attached. Drugs which help maintain her blood pressure have been discontinued and her body is now performing that function on its own. Occasional doses of medicine are used to control diarrhea. There is no present intent of the doctors or hospital personnel to withhold medicines which might become needed. For example, antibiotics would be used in the event of respiratory infection. Feeding is now accomplished through a naso–gastric tube. The catheter remains in place.

6. Mrs. Severns' coma is not as deep as it was shortly after her admission to the Wilmington Medical Center. Mrs. Severns is able to breathe without assistance to a degree in that she can be taken off the respirator for several hours, but she cannot be taken off the respirator indefinitely. Mrs. Severns demonstrates certain primitive reflexes. She demonstrates deep tendon reflexes such as a jerk of the lower part of the leg and foot in response to a tap of the knee. She also demonstrates the Babinski response by abnormally moving the ankle and toes in response to a scratching of the sole of the foot. Her body assumes a decerebrate position in response to a supra–orbital pressure. The right eye reacts to light and shows deviation to the right when the right ear is irrigated with ice water. In

1. At his request, the Court appointed Mr. Severns as guardian of his wife's property. See 12 *Del.C.* § 3914.

addition, Mrs. Severns demonstrates a primitive sucking reaction if her lips are touched. From the medical, neurologic point of view, the above responses do not imply that conscious, sentient brain functions exist but just that her body is capable of certain reactions without conscious awareness.

7. Mrs. Severns is not suffering and is not aware of pain or discomfort.

8. If the respirator were removed and not restored, Mrs. Severns would be susceptible to pneumonia and respiratory infections, which most persons could survive without difficulty. These infections would, if at all severe, probably be fatal to her. If the respirator were removed and not restored and no pneumonia or infection takes place, Mrs. Severns could live for months or maybe years.

9. Since there is no generally recognized treatment that may decrease the comatose state and bring Mrs. Severns closer to awareness, her recovery, if any, would be by means of the body's healing processes.

10. The injury to the upper portion of Mrs. Severns' brain is extensive. The brain functions dealing with awareness, conscious thought, memory, personality, intellectual functions and speech are contained in the upper portion of the brain.

11. The injury to the lower portion of Mrs. Severns' brain, the brain stem, has less serious consequences. The brain stem controls the primitive body functions of, among other things, breathing, blood pressure and heart rate. Mrs. Severns has demonstrated some recovery to that portion of the brain. It is possible, and quite likely, that Mrs. Severns' brain stem will, in time, heal itself sufficiently to be able to control the primitive body functions necessary for her survival.

12. The brain stem functions or the vegetative functions, by virtue of being primitive, tend to recover when injured. It is a kind of built-in survival mechanism. If a patient with a brain stem injury is kept alive long enough, there is generally a tendency to recover functions adequate for a vegetative existence. Mrs. Severns is a patient who had an injury to her brain that affected predominantly the higher levels; those levels are more susceptible [sic] to injury and less able to recover.

13. In order to determine the likelihood of the recovery of a comatose patient who has suffered injury to the brain, it is necessary to take into account, among other things, age (in as much as older people do not possess the same recovery powers as younger people), the nature and extent of the injury, the recovery made by the patient to date and the amount of time it has taken the patient to reach various states of recovery.

14. Two Wilmington area physicians, one, a highly skilled and respected neurosurgeon and the other, a highly skilled and respected neurologist, have examined Mrs. Severns and reviewed her chart. Based upon their observations, the factors listed in paragraph 13 and other relevant factors, they have reached the following determinations regarding the possibility of Mrs. Severns' recovery from her comatose state:

(a) One physician is of the opinion that within the bounds of reasonable medical certainty, Mrs. Severns will not recover those brain functions which would permit her to resume a sapient and sentient adult existence. The other physician is of the opinion that such a recovery by Mrs. Severns is not impossible, although her chances of recovery to that state are the remote probability of one in ten thousand.

(b) One physician is of the opinion that within the bounds of reasonable medical certainty Mrs. Severns will not recover those brain functions which are indicative of the mental state of a three year old person. The other physician is of the opinion that there is the remote probability of Mrs. Severns' recovery of those brain functions indicative of a mental state of a three year old of one in one thousand.

(c) One of the physicians is of the opinion that within the bounds of reasonable medical certainty Mrs. Severns will not recover brain functions indicative of a new born to a three month old child. The other physi-

cian is of the opinion that there is a reasonable medical probability of one in one hundred that Mrs. Severns will recover those brain functions indicative of a new born to a three month old child.

(d) The physician who is unable to completely preclude any hope of recovery by Mrs. Severns to sapient or cognitive existence is of the opinion that if Mrs. Severns failed to demonstrate any significant improvement within four to six months after the beginning of the coma, the probability of her recovery of a cognitive or sapient existence would diminish to zero.

15. Dr. Gibbs will continue the use of or restore the respirator to Mrs. Severns, if medically indicated unless there were an order to the contrary from a Delaware Court. Dr. Gibbs will continue the administration of medicines to Mrs. Severns as medically indicated, unless there were an order to the contrary from a Delaware Court.

16. The doctors' orders applicable to Mrs. Severns do not contain a "no code blue" order, that is, an order which would preclude the application of medical procedures and machinery in the event of an emergency or life threatening situation. Unless there were such an order by a doctor, the personnel of a hospital or other health care facility would apply to Mrs. Severns all treatment and machinery medically indicated to restore her in the event of an emergency or life threatening situation. Dr. Gibbs has indicated he will not enter a "no code blue" order unless a Delaware Court orders that such a "no code blue" order is permissible.

17. Current medical standards in the community of Wilmington require that in cases similar to Mrs. Severns that the respirator be continued as long as physiologically indicated.

18. Current medical standards in the community of Wilmington concerning the removal of the respirator require that the patient be medically evaluated to determine the patient's ability to adequately control the patient's own respiration.

19. Currently in the medical community of Wilmington, although there is no established medical practice, physicians commonly order that a person whose stage of illness precludes recovery not be resuscitated in the event of a life threatening situation, particularly, if the patient or family has requested that such procedures not be undertaken.

20. The standard medical practice in the community of Wilmington is that medicines are given to patients in all stages of illness when medically required.

21. Standard medical practice in the community of Wilmington requires that a patient who is unable to feed himself be fed or otherwise provided with nourishment.

22. Standard medical practice in the community of Wilmington, in cases such as Mrs. Severns is to continue the application of a tracheotomy tube to enable the cleaning of the airway to avoid infection. If a patient develops a sufficient cough reflex, then it is the standard medical practice to remove the tracheotomy tube.

23. Mrs. Severns is not dead under any standard, legal or medical definition of death.

24. Mrs. Severns is incompetent in that she is not mentally ill, but by reason of physical incapacity is unable properly to manage and care for her person or property.

25. The Wilmington Medical Center does not have an Ethics Committee or like body which has as a part of its functions the approval or disapproval of the discontinuance of life support systems."[2]

In the complaint, Mr. Severns asks that the Court enter an order appointing him as guardian of the person of his wife and that the Court, *inter alia,*

---

2. The stipulation of facts also includes the following: Mrs. Severns' husband, her children (all of whom are adults) and her brothers and sisters join in requesting removal of the life support systems; Mrs. Severns had been an active member of the Euthanasia Council of Delaware; and she had made statements to the effect that she wanted to make a "living will" and that she did not want to be kept alive as a "vegetable" or by extraordinary means.

"(c) [a]uthorize the petitioner [Mr. Severns], as guardian, to cause, or request even if death of the infirm person [Mrs. Severns] is likely;

(i) The discontinuance of the respirator and that use of the respirator not be restored to the infirm person.

(ii) The discontinuance of the tracheotomy and that it not be replaced and that no alternative intubation of the airway be used.

(iii) The discontinuance of the administration of drugs and that the administration not be restored.

(iv) The placing of a continuing order to any doctor and hospital or health care personnel that in the event of an emergency or situation threatening the life of the infirm person, that no restorative measures be undertaken. Specifically, a "no code blue" order be entered at the appropriate place in the health care facility where the infirm person is being maintained.

(d) Enter an order restraining the Attorney General from instituting or allowing any criminal prosecution which otherwise might ensue in the event of cessation of life in the infirm person resulting from the exercise of the aforesaid discontinuance authorizations were they to be granted to the guardian.

(e) Enter an order restraining the respondents and any other person from preventing any voluntary act in accordance with the authorizations, if any, granted by the Court.

. . . . .

(g) Enter an order that any physician or other person acting under the direction of a physician or other individual, or any health care facility which acting in accordance with an order of this Court, who causes or participates in the withholding or withdrawal of life sustaining procedures from the infirm person shall not be subject to civil liability therefrom; and any physician or other person acting under the direction of a physician who participates in the withholding or withdrawal of life sustaining procedures from the infirm person in accordance with an order of this Court shall not be guilty of any criminal act or of unprofessional conduct, other determinations to the contrary notwithstanding."

After the complaint was filed, the Court of Chancery, at the request of all parties, certified the following questions to this Court:

"1. Considering established medical standards and practices, or the absence thereof, may the Court of Chancery grant the relief sought by petitioner, or is the case non-justiciable as being solely within the province of the practice of medicine?

2. In order for the Court of Chancery to grant the relief sought, must there be legislation authorizing and providing guidelines for the relief sought?

3. Does 12 *Del.C.* § 3914 permit the appointment of a guardian of the person who may carry out the relief requested?

4. Considering established medical standards and in the absence of authorizing legislation, may a guardian of an incompetent person exercise the incompetent person's right of privacy or exercise a right to self determination or rely on any other basis to cause the discontinuation of procedures sustaining the incompetent person's life if the likely result of the discontinuance is the death of the incompetent person?

5. Is the discontinuance of procedures sustaining the incompetent person's life, a crime, and if it is a crime, would that alone prohibit the Court of Chancery from authorizing the guardian of the person to cause such a discontinuance?

6. If the discontinuance of procedures sustaining the incompetent person's life constitutes a crime or unprofessional conduct, may the Court of Chancery enjoin the criminal prosecution or disciplinary action against the perpetrator or accessories, or, in the alternative, may the Court of Chancery decree that any perpetrator or accessory not be subject to civil, criminal or unprofessional conduct liability?

7. Should the Court of Chancery give probative weight to the statements made to third persons by the incompetent, prior to her incompetency, relating to her desire for discontinuance of life sustaining procedures in the event of her suffering an incapacitating injury or illness?

8. If the relief sought by the petitioner is granted, what procedures, if any, should be followed before the guardian exercises the relief?"

Thereafter, this Court accepted certification as to Question No. 2 but refused to receive the remaining Questions. Our order provided, in part, as follows:

"(1) Question No. 2 of the Certification is as follows:

'In order for the Court of Chancery to grant the relief sought, must there be legislation authorizing and providing guidelines for the relief sought?'

(2) The parties have unanimously agreed that, for the purposes of Question No. 2, the 'relief sought' consists of the following:

(a) The appointment of the petitioner as guardian of the person and property of Mrs. Severns, with authorization from the Court to terminate, either by not continuing or not restoring, some or all of her life sustaining systems, if the likely result is the death of Mrs. Severns.

(b) Determination of whether such termination with such 'likely result' would constitute a crime or unprofessional conduct–and if so:

(1) Would that alone prohibit the Court of Chancery from authorizing the guardian to cause such termination? and

(2) May the Court of Chancery enjoin criminal prosecution or disciplinary action against the perpetrators or accessaries or, in the alternative, decree that any perpetrator or accessary not be subject to civil, criminal or unprofessional conduct liability?"

Counsel have briefed and orally argued Question No. 2 on the basis of the Court's order and the record relevant thereto.

### III

Invoking the broad principles announced in *Matter of Quinlan*, N.J.Supr., 70 N.J. 10, 355 A.2d 647 (1976), cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976), plaintiff argues that the Court of Chancery, in the absence of legislation, can grant the relief sought on the basis of the constitutional right to privacy, cf. *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and on the common law right of self–determination, cf. *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). And, he contends, existing law "does not prohibit the exclusion of resuscitative measures" nor bar the Court of Chancery from granting the relief sought.

The Medical Center generally supports Mr. Severns' position and argues that the Guardianship Statute, 12 *Del.C.* § 3914, authorizes the Court of Chancery to grant the relief he seeks.[3] The Center also contends that, (a) the Court may declare that the law does not prohibit the exclusion of resuscitative measures; (b) the relief sought would

---

**3.** 12 *Del.C.* § 3914 provides in part, as follows:

"(a) Whenever any person not mentally ill, a resident in this State, by reason of advanced age or mental infirmity or physical incapacity is unable properly to manage and care for his person or property and in consequence thereof is in danger of dissipating or losing such property or of becoming the victim of designing persons or, in the case where a guardian of the person so sought, such person is in danger of substantially endangering his health, or of becoming subject to abuse by other persons or of becoming the victim of designing persons, such person, his mother, father, brother, sister, husband, wife, child, next of kin, creditor, debtor, any public agency or, in the absence of such person or persons or public agency or their refusal or inability to act, any other person may file in the Court of Chancery of the county in which such aged, mentally infirm or physically incapacitated person resides his petition, under oath, setting forth the facts, praying the Court to adjudge that such person is unable properly to manage and care for his person or property and requesting the appointment of a guardian of the person or property of such person."

not constitute a crime or unprofessional conduct; and (c) the Court may enjoin a criminal prosecution, disciplinary action or civil liability proceeding arising out of the relief requested by Mr. Severns.

The Attorney General and the attorney for Mrs. Severns are in opposition to those arguments. The Attorney General counters by contending that § 3914 prohibits the Court from appointing a guardian whose purpose is to terminate medical treatment necessary to sustain the life of an incompetent person. And, he argues, legislation is essential for the relief sought, the right to privacy is not applicable because State action is not involved, and terminating the life support systems of Mrs. Severns may be construed as a crime and/or unprofessional conduct.

Supplementing those arguments, the attorney for Mrs. Severns says that a third person may not assert, on her behalf, a constitutional right (of privacy) against bodily invasion and that all essential elements of the crimes of Murder, 11 *Del.C* § 636, and Endangering an Incompetent, 11 *Del.C.* § 1105, are present in the relief requested; and, he contends, the General Assembly, in the Criminal Code (Title 11) and in § 3914, has declared the public policy of the State to be against the relief sought.

Thus Mr. Severns and the Medical Center urge that the Court answer Question No. 2 in the negative, that is, legislation authorizing and providing guidelines is not required before the relief sought is granted. The Attorney General and the attorney for Mrs. Severns argue that such legislation is essential and, therefore, Question No. 2 should be answered affirmatively. Dr. Gibbs has not taken a position on the Question.

IV

Before discussing our own law, we note what has been occurring in other jurisdictions. Generally speaking, a few courts have granted relief of the kind sought by Mr. Severns without enabling legislation. In so doing, those courts have undertaken to create a code of conduct and procedure for doctors, hospitals and others with an interest in a person who has irreversible brain damage. The seminal case, of course, is *Quinlan*. There, the New Jersey Supreme Court engaged in judicial pioneering when it overruled a Trial Court and held, in a case involving a 22–year–old young lady who was comatose and in a chronic "vegetative" state, that

"[u]pon the concurrence of the guardian and family of Karen [Quinlan], should the responsible attending physicians conclude that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state and that the life–support apparatus now being administered to Karen should be discontinued, they shall consult with the hospital, 'Ethics Committee' or like body of the institution in which Karen is then hospitalized. If that consultative body agrees that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state, the present life–support system may be withdrawn and said action shall be without any civil or criminal liability therefor on the part of any participant, whether guardian, physician, hospital, or others."

355 A.2d at 671.

The most recent reported opinion was announced by the Massachusetts Supreme Judicial Court. *In re Spring*, Mass.Sup.Jud. Ct., —— Mass. ——, 405 N.E.2d 115 (1980). There, an incompetent person was receiving life–prolonging hemodialysis treatment and the Court noted that the issue was "another in a series of recent cases in which we have been called upon to apply legal principles to questions of life and death presented by modern medical procedures." 405 N.E.2d at 118. The Court then said this about the principles of law applicable to such cases:

"[T]here is something approaching consensus in support of some of the principles elaborated in ... [*Superintendent of Belchertown State School v. Saikewicz*, Mass.Sup.Jud.Ct., 373 Mass. 728, 370 N.E.2d 417 (1977)]. A person has a strong interest in being free from nonconsensual invasion of his bodily integrity

and a constitutional right of privacy that may be asserted to prevent unwanted infringements of bodily integrity. Thus a competent person has a general right to refuse medical treatment in appropriate circumstances, to be determined by balancing the individual interest against counterveiling State interests, particularly the State interest in the preservation of life. In striking that balance account is to be taken of the prognosis and of the magnitude of the proposed invasion. The same right is also extended to an incompetent person, to be exercised through a 'substituted judgment' on his behalf. The decision should be that which would be made by the incompetent person, if he were competent, taking into account his actual interests and preferences and also his present and future incompetency."

405 N.E.2d at 119.

But as to the procedure to be followed in such cases, the Court differed significantly from the "delegation" approach adopted by the Supreme Court of New Jersey in *Quinlan*. The Court approved a finding by the Trial Court that the incompetent "would, if competent, choose not to receive the life prolonging treatment," 405 N.E.2d 115, but it reversed a ruling which authorized the attending physician and the incompetent's wife to make the decision as to whether dialysis treatment should be continued or terminated. On this key issue, the Court concluded that the Trial Judge could not delegate that decision which he alone could make based on the evidence available to him; the Court said:

"What, then, is the significance of our disapproval of a shift of ultimate responsibility away from the courts? We in no way disapprove the practice of committee review of decisions by members of a hospital staff. But private medical decisions must be made responsibly, subject to judicial scrutiny if good faith or due care is brought into question in subsequent litigation, although the concurrence of qualified consultants may be highly persuasive on issues of good faith and good medical practice. This is true of medical decisions generally, and is no less true of a decision to withhold medical treatment from an incompetent patient. When a court is properly presented with the legal question, whether treatment may be withheld, it must decide that question and not delegate it to some private person or group. Subsidiary questions as to how to carry out the decision, particularly purely medical questions, must almost inevitably be left to private decision, but with no immunity for action taken in bad faith or action that is grievously unreasonable."

405 N.E.2d at 122.

In a long and scholarly opinion, the New York Supreme Court, Appellate Division, has "firmly agree[d] with the major sister state decisions" announced in *Quinlan* for New Jersey and in *Saikewicz* for Massachusetts. *Eichner v. Dillon*, N.Y.App.Div., 73 A.D.2d 431, 426 N.Y.S.2d 517, 539 (1980).[4] Acting without a predicate in statutory law, the Court held as follows on the substantive legal issue, 426 N.Y.S.2d at 539.

"By parity of reasoning, the constitutional right to privacy [announced in *Roe v. Wade*, U.S.Sup.Ct., 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)], we believe, encompasses the freedom of the terminally ill but competent individual to choose for himself whether or not to decline medical treatment where he reasonably believes that such treatment will only prolong his suffering needlessly, and serve merely to denigrate his conception of the quality of life. The decision by the incurably ill to forego medical treatment and allow the natural processes of death to follow their inevitable course is so manifestly a 'fundamental' decision in their lives, that it is virtually inconceivable that the right of privacy would *not*

---

4. Interestingly enough, Brother Joseph Charles Fox, the ward who was the subject of the proceedings, died before the Appellate Division announced its ruling. The Court did not regard the appeal as moot, saying,

"Since the controversy here is one likely to recur and may in the future again evade review, the issues presented are plainly not moot."

426 N.Y.S.2d at 523.

apply to it. Individuals have an inherent right to prevent 'pointless, even cruel, prolongation of the act of dying' (*Matter of Dinnerstein* [—— Mass.App. ——], 380 N.E.2d [134] at 137, *supra*). Stated in simpler and more fundamental terms, as a matter of constitutional law, a competent adult who is incurably and terminally ill has the right, if he so chooses, not to resist death and to die with dignity (see *Rutherford v. United States*, 438 F.Supp. 1287, 1299, *supra; Satz v. Perlmutter*, 362 So.2d 160, 162, *supra; Superintendent of Belchertown State School v. Saikewicz* [373 Mass. 728], 370 N.E.2d [417] at p. 426, *supra; Matter of Quinlan* [70 N.J. 10], 355 A.2d [647] at p. 663, *supra*; see, also, Cantor, A Patient's Decision to Decline Life–saving Medical Treatment: Bodily Integrity versus the Preservation of Life, 26 Rutgers L.Rev. 228; Paris, Compulsory Medical Treatment and Religious Freedom: Whose Law Shall Prevail?, 10 U.San.Fran.L.Rev. 1; Note, The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State, 51 N.Y.U.L.Rev. 285, 294)."

And the Court agreed with *Quinlan* and *Saikewicz* that a "substitute" or "proxy" judgment could be made by the patient's guardian. 426 *N.Y.S.2d* at 548. But on the critical question of procedure, the Court agreed with Massachusetts that

> "the neutral presence of the law is necessary to weigh . . . [relevant] factors, and, thus, judicial intervention is required before any life–support system can be withdrawn."

426 N.Y.S.2d at 550.

The Court then spelled out its own procedure, as follows;

> "Accordingly, we hold that the following procedure shall be applicable to the proposed withdrawal of extraordinary life–sustaining measures from the terminally ill and comatose patient. The physicians attending the patient must first certify that he is terminally ill and in an irreversible, permanent or chronic vegetative coma, and that the prospects of his regaining cognitive brain function are extremely remote. Thereafter, the person to whom such certification is made, whether a member of the patient's family, someone having a close personal relationship with him, or an official of the hospital itself, may present the prognosis to an appropriate hospital committee. If the hospital has a standing committee for such purposes, composed of at least three physicians, then that committee shall either confirm or reject the prognosis. If the hospital has no such standing committee, then, upon the petition of the person seeking relief, the hospital's chief administrative officer shall appoint such a committee consisting of no fewer than three physicians with specialties relevant to the patient's case. Confirmation of the prognosis shall be by a majority of the members of the committee, although lack of unanimity may later be considered by the court.

> Upon confirmation of the prognosis, the person who secured it may commence a proceeding pursuant to article 78 of the Mental Hygiene Law for appointment as the Committee of the incompetent, and for permission to have the life–sustaining measures withdrawn. The Attorney General and the appropriate District Attorney shall be given notice of the proceeding and, if they deem it necessary, shall be afforded an opportunity to have examinations conducted by physicians of their own choosing. Additionally, a guardian ad litem shall be appointed to assure that the interests of the patient are indeed protected by a neutral and detached party wholly free of self–interest."

416 *N.Y.S.2d* at 550.[5] See also *Satz v. Perlmutter*, Fla.Supr., 379 So.2d 359 (1980), in which the Supreme Court of Florida affirmed an order of the District Court of Appeals, 362 So.2d 160 (1978), permitting removal of an artificial life–sustaining de-

---

**5.** It is our understanding that an appeal has been taken by the District Attorney who opposed the petition.

vice from a competent but terminally ill adult; *In Re Boyd*, D.C.Ct.App., 403 A.2d 744 (1979), adopting the "substituted judgment rule" in a case seeking authority to administer psychotropic drugs to a mentally ill person; Annot., 79 *A.L.R.3d* 237; Power of Court to order or authorize discontinuation of extraordinary medical means of sustaining life.

### V.

As those opinions by other courts and the developing literature make clear, the evolution of medical technology is compelling the public, through the courts, if not the legislatures, to formulate new standards and procedures for measuring the conduct of persons involved in the health care of persons with irreversible brain damage. And this case shows the wide spectrum of values which the question invokes. As we observed at the beginning of this opinion, those values relate to nothing less than the life or death of the ward. Our State has struggled with after–birth life–and–death issues before this, but almost always in a criminal context. With that single exception—which involves conduct so evil that the ultimate penalty (death) is imposed—our society has sustained life, and our medical techniques and our laws have been applied to preserve it.[6]

Now, however, we are on the threshold of new terrain—the penumbra where death begins but life, in some form, continues. We have been led to it by the medical miracles *which now compel us to distinguish between* "death," as we have known it, and death in which the body lives in some fashion but the brain (or a significant part of it) does not. The stipulated facts bring those generalities into focus in this case. Thus, the brain stem, which "controls the primitive body functions" tends "to recover when injured" so that it will sustain a "vegetative existence."

Reduced to one sentence and applied here, this implicitly means that Mrs. Severns may have, through the use of a respirator and other life–sustaining supports, a vegetative existence but not the brain functions which would "permit her to resume a sapient and sentient adult existence."

It is against this background that Mr. Severns has invoked the aid of the Court of Chancery.

### VI

■ A number of Delaware cases have held that the power of the Court of Chancery to appoint a guardian of the person is derived entirely from statute. See, for example, *In re Markel*, Del.Supr., 254 A.2d 236 (1969); and *In re Conner*, Del.Ch., 43 Del.Ch. 310, 226 A.2d 126 (1967). We recognize that, speaking generally, all Chancery jurisdiction is based on the absence of an adequate remedy at law, a principle which has been codified in this State. 10 *Del.C.* § 342.[7] We recognize also that § 342, negative though it is, may be construed as implicitly permitting the Court of Chancery to appoint a guardian of the person to exercise a protected constitutional right of a ward, if § 3914 does not grant such power.[8]

For present purposes, however, we regard § 3914 as broad enough to permit the Court of Chancery to appoint Mr. Severns as "guardian of the person" of his wife because, "by reason of . . . mental infirmity

---

**6.** The Preamble to the Declaration of Independence states that all men "are endowed by their Creator with certain unalienable rights, that among these are Life, . . . ." The Fifth Amendment to the Federal Constitution implements that by providing that "[n]o person shall be . . . deprived of life . . . without due process of law . . . ." Article I § 7 of the Delaware Constitution is to the same effect.

**7.** 10 *Del.C.* § 342 reads as follows:
"The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."

**8.** Compare 10 *Del.C.* § 341, which provides:
"The Court of Chancery shall have jurisdiction to hear and determine all matters and causes in equity."
Generally, as to the jurisdiction of the Court of Chancery, see *Glanding v. Industrial Trust Co.*, Del.Supr., 28 Del. 499, 45 A.2d 553, 557 (1945).

or physical incapacity," she is "unable properly" to "care for ... [her] person." Cf. 27 *Am.Jur.2d* Equity § 69. She "has remained in a coma" for more than five months and, for that reason alone, is unable properly to care for her person. Given the necessity for feeding her through a naso–gastric tube and for providing her with routine medical care and testing, all of which are self–evident from the stipulation, Mrs. Severns is certainly "in danger of substantially endangering [her] health" if she does not authorize such care. Obviously she cannot do that because she is comatose. Thus the threshold requirements for appointment of a guardian of the person are met, we think, on the stipulated facts in the record and the Court may appoint Mr. Severns as guardian of the person of his wife. Following such appointment the Court of Chancery may authorize Mr. Severns as guardian to exercise the powers usually incident to the appointment. Cf. 12 *Del.C.* § 3921, etc.; Rule 179 of the Court of Chancery. And, on special application after the requisite showing is made, the Court may authorize the guardian to exercise additional powers appropriate to the circumstances, as the Chancellor determines in his discretion.

■ While this analysis of the issue may seem somewhat elemental, it has enabled us to reach the critical question regarding relief by following settled Delaware case law governing the appointment of a guardian. Properly understood, the Question submitted to the Court divides into two fundamental parts: the first concerns the power of the Court to appoint a guardian of the person of Mrs. Severns, and, the second relates to the power of the Court to authorize such guardian to take certain actions with respect to the medical techniques and apparatus which sustain her life. The power of the Court to appoint a guardian is jurisdictional and unless and until that is established, all questions with respect to what a guardian may be empowered to do are academic. We are satisfied that the requirements for jurisdiction are met and now we may proceed to the power question. 12 *Del.C.* § 3914; *In re Markel*, supra.

### A.

■ As we have indicated, the Medical Center argues that § 3914 authorizes the Court of Chancery to grant the relief sought by the Guardian. The Attorney General and the attorney for Mrs. Severns have a quite different view of it; indeed, they say that the Statute prohibits the Court from granting the relief in issue.

We need not undertake a line–by–line analysis of the Statute because we agree with neither hypothesis. Briefly stated, our view is that § 3914 falls between the two contentions which have been submitted. As we read it, the Statute outlines the predicate requirements for appointment of a guardian of the person and, while some guardianship powers may be implicitly derived from its language, nothing therein, or in the cases construing § 3914 persuades us that it authorizes the relief sought here. Nor does the Statute prohibit the Court from granting that relief. Rather, it seems to us that the Statute is silent on the critical issues proposed in this appeal. We also add (gratuitously) that even if § 3914 were regarded as ambiguous on whether it authorizes discontinuance of life–support systems, in all candor, given the subject matter, we would construe the language of the Statute against a Legislative grant of such power. The problem is too profound to imply Legislative approval of life–death powers from the broad language used in a general guardianship statute, much of which is directed to property matters.

### B.

The next question, then, is whether the Court, acting without a statutory basis or guidelines, may grant the "relief sought." Specifically, as our order accepting the certification states, Mr. Severns seeks:

"... authorization from the Court to terminate, either by not continuing or not restoring, some or all of her life sustaining systems, if the likely result is the death of Mrs. Severns.

(b) Determination of whether such termination with such 'likely result' would

constitute a crime or unprofessional conduct—and if so:

(1) Would that alone prohibit the Court of Chancery from authorizing the guardian to cause such termination? and

(2) May the Court of Chancery enjoin criminal prosecution or disciplinary action against the perpetrators or accessaries or, in the alternative, decree that any perpetrator or accessary not be subject to civil, criminal or unprofessional conduct liability?"

While the question is stated in terms of the absence of enabling legislation, plainly, the underlying issues invoke values which affect a very large section of the community.

For example: Would terminating, or not continuing or restoring, "some" of the systems which now sustain Mrs. Severns' life (if the likely result is her death) be a crime? The possible crimes include those relating to homicide, that is, criminal negligence in violation of 11 *Del.C.* § 631 and murder in violation of 11 *Del.C.* §§ 635, 636; endangering the welfare of an incompetent person in violation of 11 *Del.C.* § 1105; and aiding a suicide in violation of 11 *Del.C.* § 645. In a real sense, any ruling by the Court granting the relief sought might well limit the parameters of such Statutes. And would the termination or the non–restoration of Mrs. Severns' life–sustaining systems, by doctors and other health care personnel, constitute "unprofessional conduct"? Are the critical decisions regarding those systems to be made administratively (by the family, doctors and/or hospital authorities), as in *Quinlan*; or only by the Court, as in *Spring* and *Eichner*?

■ Both our Criminal Code, 11 *Del.C.* § 101, etc., and the Medical Practice Act, 24 *Del.C.* § 1701, etc., are the products of legislation enacted by the General Assembly. And, as such, they are the public policy of our State. Contemplated actions (or inaction) which are expected to determine whether a person lives or dies, plainly,

should be authorized or conditioned or barred, as the case may be, by the General Assembly. The case under submission here relates only to Mrs. Severns, but the principle and the procedures adopted will undoubtedly govern other similar cases. Given the community values at stake, specific action by the General Assembly is most desirable.

The same point was made by the Florida Supreme Court in *Satz*, when the Court said:

"Because the issue with all its ramifications is fraught with complexity and encompasses the interests of the law, both civil and criminal, medical ethics and social morality, it is not one which is well–suited for resolution in an adversary judicial proceeding. It is the type issue which is more suitably addressed in the legislative forum, where fact finding can be less confined and the viewpoints of all interested institutions and disciplines can be presented and synthesized. In this manner only can the subject be dealt with comprehensively and the interests of all institutions and individuals be properly accommodated."

379 So.2d at 360. And the Appellate Division said much the same thing in *Eichner*:

"... an act of the [New York] Legislature would ... be most welcome and appropriate. No one seriously doubts that the 'Legislature has far greater capabilities to gather relevant data and to elicit expressions of pertinent opinion on the issues at hand.'" [Citation omitted.]

426 N.Y.S.2d at 535.

We agree with these observations and we earnestly invite the prompt attention of the General Assembly to them, with the hope that it will enact a comprehensive State policy governing these matters which are, in the words of *Quinlan*, "of transcendent importance." 355 A.2d at 652.

We must caution, however, that neither the Court in Florida nor the Court in New York refused to rule without legislative ac-

tion. On the contrary, both Courts proceeded in the absence of a statutory basis.[9]

## C.

The question thus narrows as to whether the Court of Chancery, at this stage in the proceeding, may order the relief sought, in the absence of legislation. As we view the question at this point in our analysis, three matters are particularly relevant: (1) the right of a guardian of the person to seek the relief in issue, (2) the power of the Court of Chancery to grant that relief, and (3) whether such relief may be granted on the present record.

### (1)

First, as to the right of a guardian to seek the relief sought, we hold that he has the right to apply for it. Ordinarily, of course, only the person whose constitutional rights are in issue may assert them in litigation. But a person in a coma is helpless—she cannot invoke her own rights, including those which may be essential to her well being. Thus one who is in a coma may require surgery or other medical treatment to which she is incapable, temporarily or permanently, of consenting; and yet, persons providing health care will not do what is necessary without a "legal" consent. Under such circumstances, the Court of Chancery, in our opinion, may recognize the right of a guardian of the person to vicariously assert the constitutional right of a comatose ward to accept medical care or to refuse it. Cf. *In re Boyd*, supra, 403 *A.2d* at 750. Indeed, as the Court said in *Eich-*

*ner,* to deny the exercise because the patient is unconscious would be to deny the right. *Eichner id.*, 426 N.Y.S.2d at 546.

We conclude that Mr. Severns, as guardian of the person of his wife, has standing to invoke her constitutional rights (including the right to privacy, *Griswold v. Connecticut,* supra), under the circumstances presented in the present record we so hold. Cf. *Eichner id.*, 426 N.Y.S.2d at 546, 547; *Quinlan id.*, 355 A.2d at 660, 661.

### (2)

We turn now to the power of the Court of Chancery to grant the relief sought. We have tried to emphasize the importance of Legislative action in establishing public policy and the elimination of all doubt in this most sensitive area of community concern. But, even without legislation, we are satisfied that the Court of Chancery has the power, indeed, it has the duty, to grant appropriate relief based upon the invocation and establishment of constitutional rights.

We distinguish between subject matter jurisdiction to hear or consider an application by a guardian for instructions, and the granting of remedial relief. We have already held that, under § 3914, the Court of Chancery has the power to appoint a guardian of the person on the present record. Plainly, such a guardian has the right to ask the Court which appoints him for permission to take specific action with respect to the ward.[10] Parenthetically, it is beyond

---

**9.** In *Satz*, the Court said:

> "Nevertheless, preference for legislative treatment cannot shackle the courts when legally protected interests are at stake. As people seek to vindicate their constitutional rights, the courts have no alternative but to respond. Legislative inaction cannot serve to close the doors of the courtrooms of this state to its citizens who assert cognizable constitutional rights. As was observed ... [in a prior] opinion of this Court ...:
>
> 'We think it is appropriate to observe here that one of the exceptions to the separation–of–powers doctrine is in the area of constitutionally guaranteed or protected rights. The judiciary is in a lofty sense the guardian of the law of the land and the Constitution is

the highest law. A constitution would be a meaningless instrument without some responsible agency of government having authority to enforce it .... When the people have spoken through their organic law concerning their basic rights, it is primarily the duty of the legislative body to provide the ways and means of enforcing such rights; however, in the absence of appropriate legislative action, it is the responsibility of the courts to do so. [Citation omitted.]' " 379 So.2d at 360–361.

**10.** The attorney for Mrs. Severns relies upon *Wilmington Trust Company v. Hahn*, Del.Supr., 241 A.2d 517 (1968), in which this Court affirmed a judgment of the Superior Court denying standing to a guardian appointed by the

dispute that, in the Delaware judicial system, no other Court has the power, under the common law or by Statute, to grant a "sufficient remedy" to the guardian concerning the withdrawal of life–support systems which now sustain Mrs. Severns. 10 *Del.C.* § 342. The situation in which Mr. Severns finds himself, then, is this: his wife has a constitutional right to accept or reject medical assistance; she is unconscious and, for that reason, she cannot assert that right; under the ruling made herein, he is the guardian of his wife's person, with standing to assert the right which she cannot voice; there is not a Delaware statute providing for the kind of relief he seeks; he cannot assert his wife's constitutional right in any law Court of this State. Of course the Court of Chancery will grant him relief under those circumstances, if he proves his right to it. That is what equity jurisprudence has been all about since its beginnings.

The historic jurisdiction of the Court of Chancery is described in *Glanding* and, more recently, in *Du Pont v. Du Pont*,[11] Del.Supr., 32 Del.Ch. 413, 85 A.2d 724 (1951), but nothing in either of those cases indicates that the fashioning of relief is limited to that which was available in 1776. On the contrary, the very essence of our system of equity, as Pomeroy states in discussing its inherent power to meet social needs, is to render the "jurisprudence as a whole adequate to the social needs . . . . [I]t possesses an inherent capacity of expansion, so as to keep abreast of each succeeding generation and age." 1 *Pomeroy's Equity Jurisprudence* (5 ed.) § 67.

■ That means that the absence of precedent is no bar to the award of appro-

priate relief. 30 *C.J.S.* Equity § 12. In discussing new questions or forms of relief, that text states as follows:

"In a case which is concededly new to the court it is important that the court should have in mind the effect on future litigation and on the development of the law which would necessarily result from a step far outside of the beaten path of common law and equity. If the customary forms of relief do not fit the case, or a form of relief more equitable to the parties than those ordinarily applied can be devised, equity may grant such new form of relief."

30A *C.J.S.* Equity § 599.

The general principle is similarly stated in 27 *Am.Jur.2d Equity* § 121:

"The absence of a precedent for the giving of relief in a case where it is evident that under general principles of equity relief should be granted is of no consequence and presents no obstacle to the exercise of the jurisdiction of an equity court. Clearly, there must be an initial time at which a precedent is handed down, and the power to make precedents has not been exhausted. The mere fact that no case is found in which relief has been granted under similar circumstances is not a controlling reason for refusing it; otherwise, the court would often find itself powerless to grant adequate relief, solely because the precise question had never arisen."

Compare *Wright v. Scotton*, Del.Supr., 13 Del.Ch. 402, 121 A. 69, 72 (1923), in which this Court stated:

"A court of equity may adapt its relief to the particular rights and liabilities of each party and determine the interests of

---

Court of Chancery which sought to annul the ward's marriage. But, in that case, the Trust Company was guardian of the *property* of the ward, not her person. At that time, § 3914 did not authorize the appointment of a guardian of the person.

11. In *Du Pont*, Justice Wolcott stated:

"It may be observed that no one denies that the general equity jurisdiction of the Court of Chancery, established originally by Sections 21 and 25 of a Colonial Act of 1726–

1736, is defined as all the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies, subject to the proviso, originally contained in Section 25 of the Colonial Act and now found as Section 4367, R.C. 1935, to the effect that the Chancellor shall not hear and determine any cause where a sufficient remedy exists at law. This is a holding of the *Glanding* case . . . . "

85 *A.2d* at 727.

all, so far as they are legitimately connected with the subject–matter and properly within the scope of the adjudication."

The relief sought by Mr. Severns is extraordinary, it is novel to Delaware and, relatively speaking, it is new in our civilization. But it does not follow that the Court of Chancery may refuse to grant it for those reasons. Indeed, the history of that Court records community concerns ranging from racial segregation to corporate fiduciary standards, for all of which the Court has had to find and adopt "sufficient remedy" for a successful plaintiff so that it might "keep abreast of each .... generation and age." *Pomeroy*, supra.

 We hold, as a general proposition and without reference to any of the specific relief sought, that the Court of Chancery has the power to grant relief to Mr. Severns in accordance with the proof which is made and the requirements of justice. *Matter of Quinlan*, supra; *In re Spring*, supra; *Eichner v. Dillon*, supra. Specific approval of any authority to continue or not restore any of Mrs. Severns' life–sustaining systems must await the holding of a necessary evidentiary hearing.[12]

In terms of the Question submitted, we hold that there need not be legislation authorizing and providing guidelines for the relief sought.

### (3)

 Finally, as to the present record, the Court of Chancery cannot grant and we cannot order any relief without an evidentiary hearing. We are sensitive to the need for a prompt adjudication of the issues presented in the lawsuit and of the additional grief which uncertainty may bring to the Severns family. But we cannot undertake to rule on these life–and–death matters–which are of "transcendent importance" to all of us–on the basis of a stipulation of facts. The problems are too large, the precedent too significant and the stipulation is too vague.[13]

As to the last point, which is crucial for present purposes, the problems presented are factual in a very significant way. For example: What *is* a life–sustaining system for a person who has been comatose for many months? Are "medicines" a part of such life–sustaining systems? If so, which medicines? Is food or nourishment a part of such life–sustaining systems? If so, to what extent? What extraordinary measures (or equipment) are a part of such systems? What measures (or equipment) are regarded by the medical profession as not extraordinary under the circumstances? What ordinary equipment is used? How is a respirator regarded in this context? What considerations are involved and who should make the decision as to the termination or restoration of "some or all of [Mrs. Severns'] ... life sustaining systems"? If there is a disagreement among the persons involved who are competent to make a responsible judgment in the matter, how is that to be resolved? Should any decision be

---

**12.** We recognize that if the Court of Chancery eventually authorizes the guardian of Mrs. Severns to discontinue a support which sustains her life–the respirator, for example–that may result in some conflict with one or more of the criminal Statutes to which we have referred. Under the Delaware Constitution, Article XV, § 1, and 29 *Del.C.* § 2501, the Attorney General is empowered to enforce the criminal laws of the State. And under general law the Court will not interfere with the performance of his discretionary duties, absent bad faith. *Delaware Optometric Association v. Sherwood*, Del. Ch., 35 Del.Ch. 507, 122 A.2d 424, aff'd, 36 Del.Ch. 223, 128 A.2d 812 (1957); 43A *C.J.S.* Injunctions § 114. However, the Court of Chancery may enjoin a criminal prosecution, to protect a property right, cf. *Economy Cleaners v. Green*, Del.Ch., 21 Del.Ch. 170, 184 A. 225

(1936), or a personal right, *Degerberg v. McCormick*, Del.Ch., 40 Del.Ch. 471, 184 A.2d 468 (1962). As the Attorney General points out in his brief, a criminal prosecution may be enjoined if it infringes upon some constitutional right, provided that the party seeking such relief demonstrates that failure to enjoin will cause irreparable harm. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Accommodation of these conflicting considerations will have to await proof of the factual context in which they arise.

**13.** So far as we have been able to determine, every reported decision in a *Severns*–type problem was based on a trial or similar evidentiary hearing. None was decided on stipulated facts agreed to by the attorneys in the case.

**1350**

unanimous? If not, whose vote controls? In what way are hospital administrative or ethics committees involved in the problem and how are they affected by a decision? What are the prevailing medical/hospital ethics which are relevant to the issue? Is there a consensus as to such ethics?

While the stipulation of facts has served its purpose in getting the litigation under way, it does not answer the kind of questions which we think are essential to a ruling. And, indeed, the physicians whose opinions are relied upon are not even identified.

To sum up, in responding to Question No. 2, we hold that:

(a) Acting under 12 *Del.C.* § 3914, the Court of Chancery shall appoint Mr. Severns as guardian of the person of his wife, with powers as provided herein.

(b) Section 3914 neither permits the Court of Chancery to grant other relief which is sought by Mr. Severns, nor does it prohibit the Court from granting such relief.

(c) In applying for the relief sought, Mr. Severns may vicariously assert any constitutional right which Mrs. Severns has and which is relevant to the relief sought.

(d) The Court of Chancery has the power to grant the relief which is sought, *Matter of Quinlan*, supra, *In re Spring*, supra, *Eichner v. Dillon*, supra, if the evidence warrants it. This ruling with respect to power is general and is not intended to approve or disapprove any specific action or non–action with respect to Mrs. Severns' life–sustaining systems.

(e) An evidentiary hearing is required to determine what relief, if any, is appropriate.

(f) As part of its ruling, the Court of Chancery shall make specific findings of fact before determining what relief is appropriate based on such findings. In so doing, the Court shall consider any relevant Act of the General Assembly and, it may also consider the absence of any action by the General Assembly in fashioning any relief which is granted.

Other arguments made by the parties need not be considered by the Court.