**In the Matter of John E. GARRETT, Jr.**

Court of Chancery of Delaware, New Castle County.

Submitted: March 1, 1988.
Decided: March 16, 1988.

Lawrence A. Hamermesh and Glen P. Trudel, of Morris, Nichols, Arsht & Tunnell, Wilmington, for John E. Garrett, Jr.

John A. Parkins, Jr. and C. Malcolm Cochran, IV, of Richards, Layton & Finger, Wilmington, for petitioners Robert Watson and Correctional Medical Systems, Inc.

OPINION

ALLEN, Chancellor.

Seeking to prevent self-inflicted life-threatening harm, a petition has been brought requesting the appointment of a guardian for John E. Garrett, a prisoner who expresses a wish to die. It is claimed that the appointment of a guardian is authorized in this instance because Mr. Garrett is suffering from a "mental infirmity" —a depressive disorder—so grave that he is "unable properly to manage and care for his person ... and in consequence thereof ... is in danger of substantially endangering his health." 12 *Del.C.* § 3914.

I.

John Garrett is a 43 year old inmate at the Delaware Correctional Center at Smyrna. He was first incarcerated in 1966 upon his conviction for manslaughter in connection with the death of his mother. Released in 1971, he was back in prison by

1972, this time serving a term of life imprisonment (commuted to 45 years) in connection with a conviction of second degree murder. He continues to serve that sentence. Thus, since he turned 21, Mr. Garrett has lived outside of prison for only one year. He has an eighth grade education and has a history of heavy alcohol use. Mr. Garrett has neither a wife nor any dependents. His father, with whom he apparently maintained some relationship, died last year and his siblings have had no contact with him for years.

Mr. Garrett seemed to have made an acceptable and accepting adjustment to prison life. By 1987, he was housed in a low security section of the prison and was trusted outside of the prison walls, while accompanied by a guard, in connection with his prison job as a maintenance worker. In December, 1987, he went before the State Parole Board for the second time seeking release from confinement. For the second time, Garrett's application was denied by the Parole Board.

Apparently in reaction to this disappointment, Garrett took a prison truck and escaped. He was located the next day in Maryland, and returned to the prison, and, pursuant to standard prison procedure, committed to a high security section of the institution. As a result of the attempted escape, Mr. Garrett now faces the prospect of an additional criminal conviction that may add as much as 15 years to his sentence.

Since his apprehension and return to custody in December, 1987, Garrett has shown signs of extreme depression. Since that time, he has been either confined in the prison infirmary or in a maximum security unit, a cell where he is kept alone for 23–hour periods. Although confined alone, he has apparently suffered from an episode of delusion when he believed that there was someone else in his cell.

Following his recapture, Garrett has exhibited marked self-destructive behavior. He has attempted to injure himself by banging his head against the wall of his cell. On December 31, 1987, he slashed his wrists so deeply that they had to be sutured. On January 14, 1988, he set fire to his bedding while he remained in bed. Most significantly, since late December, he has refused to consume food. At first, his self-imposed starvation was intermittent. By late January, he was consistently refusing to take any food at all.

On February 4, 1988, Robert Watson, the Commissioner of Delaware's Department of Corrections, filed an emergency petition with this court, pursuant to 12 *Del.C.* § 3915, seeking the appointment of an interim guardian to consent to medical treatment and the forced feeding of Mr. Garrett. Testimony by physicians at that time established that, as a result of his refusal to eat or to drink, Mr. Garrett faced the likely prospect of serious injury or death within a few days unless steps were taken to nourish him. After a hearing on that day, the court (1) appointed petitioner Watson as Garrett's guardian on an interim basis; (2) fixed a hearing date for March 1, 1988 for further consideration of the matter; and (3) appointed counsel to represent Mr. Garrett.

Subsequently, a nasopharyngeal tube was used to force Mr. Garrett to take nourishment and certain antidepressant medications have been administered to him. The nutrition has had a noticeable effect upon Mr. Garrett; the antidepressants have not altered his mood.

## II.

An evidentiary hearing has now been completed on the petition to have a guardian of Mr. Garrett's person appointed. This is the decision on that application.

The standard for appointing a guardian is set by 12 *Del.C.* § 3914. That section provides as follows:

(a) Whenever any person not mentally ill, a resident in this State, by *reason of advanced age or mental infirmity* or physical incapacity is *unable properly to manage and care for his person* or property and *in consequence thereof* is in danger of dissipating or losing such property or of becoming the victim of designing persons or, in the case where a guardian of the person so sought, such

person *is in danger of substantially endangering his health,* or of becoming subject to abuse by other persons or of becoming the victim of designing persons, such person, his mother, father, brother, sister, husband, wife, child, next of kin, creditor, debtor, any public agency or, in the absence of such person or persons or public agency or their refusal or inability to act, any other person may file in the Court of Chancery of the county in which such aged, mentally infirm or physically incapacitated person resides his petition, under oath, setting forth the facts, praying the Court to adjudge that such person is unable properly to manage and care for his person or property and requesting the appointment of a guardian of the person or property of such person.

(emphasis supplied.)

Accordingly, every petition for the appointment of a guardian of a person involves three principal questions:

(1) Is the proposed ward "unable properly to manage and care for his person;"

(2) Is such inability "a result of advanced age or mental infirmity or physical incapacity;" and

(3) Is the proposed ward, as a consequence, "in danger of substantially endangering his health."

In this instance, the danger to Mr. Garrett's health is plain. The dispositive issue arises from a merger of questions (1) and (2). That is, it is clear here that Mr. Garrett *will not* properly manage and care for his person, but it is not so apparent that he is "unable" to do so. Thus, the question is whether his decision to try to end his own life is "a result of mental infirmity" or, instead, is the act of an essentially rational and "non-infirm" mind reacting to objective conditions that it finds no longer bearable.

Before turning to a review of the testimonial evidence, I should make several introductory observations. First, suicide is not a crime in Delaware, although the law disfavors and discourages it. It is, for example, a class D felony to aid or assist another in a suicide. *See* 11 *Del.C.* § 645.[1]

Thus, while the criminal law now implicitly recognizes a zone of privacy in which such an act may be accomplished, exercise of such a dark right is not favored or encouraged. *See Severns v. Wilmington Medical Center, Inc.,* Del.Supr., 421 A.2d 1334 (1980); *John F. Kennedy Memorial Hospital v. Heston,* 58 N.J. 576, 279 A.2d 670 (1971).

The second preliminary point that should be noted is that this case involves no first amendment aspect. Persons may elect to go on a hunger strike for political reasons: to call attention to social conditions that they find intolerable. Mohandas Gandhi is perhaps the most notable example of this technique of protest, and Northern Irish Catholic prisoners of a few years ago, a well-known recent example. Such actions involve an important, indeed a predominating, first amendment aspect not involved in this case. Mr. Garrett does not claim that his attempt to starve himself was a hunger strike or included any expressive element.

Thirdly, this case, as I view it, does not involve an evaluation of a protectable privacy interest that Mr. Garrett may have vis-a-vis the State by reason of the due process clause of the Fourteenth Amendment. The issue presented is whether Mr. Garrett is competent at this time to make decisions regarding his personal care. If he is judged to be competent (in the sense described in Section 3914), and he thereafter decides to end his life through starvation, then—given the fact that his custody is given over to the Department of Correction—an issue will arise whether the State has a right in the circumstances to compel. him to take nourishment despite the usual recognition (or unfocused-upon assumption) of a right of all adult persons to control what food is taken by them. *See, e.g., Commissioner v. Myers,* 379 Mass. 255, 399 N.E.2d 452 (1971); *Sconiers v. Jarvis,* 458 F.Supp. 37 (D.Kan.1978).

The last introductory comment I make is a disclaimer. A concept central to the operation of Section 3914 is the term "mental infirmity." That term has not yet devel-

---

1. A class D felony may be punished by impris-

onment for a term not to exceed ten years.

oped in Delaware or elsewhere, so far as limited legal research discloses, a specific, technical legal meaning. Nor is it a medical or scientific term. When, in a guardianship setting, a court is faced with behavior regarded as sufficiently deviant to be defined as problematic, psychologists, and physicians including psychiatrists, may give helpful guidance on the presumed causes of such behavior and prospects for "treatment," that may moderate or eliminate the behavior. Their expertise, however, does not extend to the question whether one is competent, just as, analogously, their expertise does not encompass the question whether one is responsible or culpable in the criminal law context. These are questions of a different type. They call for a normative, not a positive or technical, answer. In the end such questions must be answered by resort to community normative standards that a judge must struggle to sense and, in his decision, replicate. The effort must be particularized. Thus, there is here no attempt to formulate a legal definition of "mental infirmity" that will be equally applicable in all future cases; a framework for analysis that may have other applications is, however, set forth. It is to that aspect of the matter that I first turn.

### III.

It seems inarguable that there are circumstances in which a rational mind, even a mind that most people would regard as a "healthy" mind, might choose death over life. *See Severns, supra; Eichner v. Dillon,* 73 A.D.2d 431, 426 N.Y.S.2d 517, 539 (1980). A situation in which this might occur would tend to involve the resolution of a profound dilemma of some sort. In some instances, for example, in the presence of some danger, certain death may be chosen by one in order to benefit others. So far from being considered irrational or infirm, such sacrifice may be heralded as noble and heroic.

In other instances, death is deliberately chosen in order to avoid the personal pain or cost of continued life. Religious mar-

tyrs, for example, who are motivated chiefly to preserve their own moral qualities, have not typically been regarded as either irrational or mentally infirm. Indeed, they too may be revered for their choice. Likewise, a choice to end the suffering involved in an advanced case of terminal illness would not be called irrational by most people, even if they could not agree upon the moral entitlement to choose death, in such circumstances. *See Palm Springs General Hospital v. Martinez,* Dade County (Fla.) Cir.Ct. (July 2, 1971) *discussed in* Byrn, *Compulsory Lifesaving Treatment For The Competent Adult,* 44 Fordham L.Rev. 13–14 (1975).

But others who seek to choose death to resolve a dilemma in which the pain of life seems the lesser of two evils, would generally be regarded as irrational, "sick" or, in the language of Section 3914, suffering from a "mental infirmity."[2] What distinguishes such cases from those in which the choice of death seems sad or tragic but not necessarily the result of "mental infirmity"? The differing evaluations must turn principally upon the evaluator's assessment of the objective circumstances out of which the decisions arise. In other words, one might ask whether a decision to end one's life, in the circumstances present, falls within the range of decisions that a reasonable person, not suffering from mental impairment or infirmity, might make in similar circumstances.

A determination that such a decision falls beyond that range, coupled with an express or otherwise clear intention to end one's life, could be expected, in my opinion, to be held to justify the appointment of a guardian. A determination that such a choice falls within such range, however, would not, in my opinion, necessarily preclude the appointment of a guardian, because an individual who makes such a decision may nevertheless be suffering from a condition, a mental infirmity, that has contributed to his decision. For example, a competent person suffering the end-stages of terminal cancer might rationally choose self-imposed death at some point. But a frankly psy-

2. Actually, "irrational" may be an inappropriate word in at least some such cases.

chotic individual in the same circumstances might be the fit subject of a guardianship. The justification for such a distinction would present itself on two levels. In the terms of the statute, one could not say in the first case, as one could on the second, that a mental infirmity was contributing to the risk of self-imposed injury. More fundamentally, the different result in these two examples could be said to reflect the enormous value placed upon the preservation of human life by our law. Where there is a legitimate ground to doubt that a decision to end one's life is the product of an essentially healthy mind faced with a tragic choice, appointment of a guardian is warranted, in my opinion. That is the situation in this instance as I view it. Stated differently, I cannot say that a person not suffering from a mental infirmity, facing conditions similar to those experienced by Mr. Garrett, might reasonably be expected to consider self-imposed death, and to act on that thought. In the absence of such a conclusion, respect for human life, in my opinion, compels the appointment of a guardian. I turn now to a brief discussion of the testimony that leads me to this result.

### IV.

At the hearing on the application, testimony from five witnesses was taken. The petitioner called Theresa A. Shank, R.N., a nurse employed at the Correctional Center, Thomas M. Penders, M.D., a psychiatrist who has been involved with Mr. Garrett's treatment for the last three months, and Dr. Louis Applebaum, a physician who has been Mr. Garrett's treating physician for at least several months. Counsel for Mr. Garrett called his client and Dr. David E. Raskin, a psychiatrist specially retained as an expert witness. Dr. Raskin had traveled to Smyrna and had interviewed Mr. Garrett for a period of about one half hour. On the basis of that session and a study of Mr. Garrett's file, Dr. Raskin felt comfortable sharing his tentative views or opinions concerning Mr. Garrett.

Mr. Garrett sat through the hearing motionless and expressionless. His eyes stared straight ahead and seemed not to blink. When called as a witness, however, at the end of the hearing, he appeared reasonably animated and rational in all respects. He stated that his life had been barely worth living, in his view, when he had some expectation of ultimate release and now that he faced additional years for his escape attempt, he had concluded that it was not worth living. He said he would passively cooperate with forced feeding through a tube, as had been done since the emergency guardianship order of February 4, but only because he was powerless and if he resisted, it would be done anyway. He stated that if the forced feeding were to stop, he would not consume any food.

Dr. Penders, one of the psychiatrists who testified, stated the opinion that Mr. Garrett was suffering from a major depressive episode as defined in *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed. Rev.), the standard publication in the field. In order to be so diagnosed under that standard, five of nine identified characteristics [3] must be present, and there must be an absence of psychotic or organic illness explaining these phenomena. Finally, in order to conclude that the depressed state itself constitutes an "illness," the mental health practitioner must conclude that it is not a temporary response to a perceived loss (bereavement) that falls within the range of reactions to such loss as might be expected to occur normally.

Dr. Penders found all of these indicia present and no satisfactory alternative explanation for their presence. He thus was of the view that Mr. Garrett could be classified as suffering from a major depressive episode. Moreover, in his opinion, that condition could likely be altered by treatment, including further and more pronounced drug treatment. Dr. Applebaum, Mr. Gar-

---

**3.** These indicia of a major depressive episode are stated to be the following: appetite disturbance, change in weight, sleep disturbance, psychomotor disturbance, decrease in energy, feelings of worthlessness or guilt, difficulty in concentration, a depressed mood or loss of interest in pleasure and thoughts of death.

rett's treating physician reached a similar conclusion.

Dr. Raskin, chief of psychiatry at the Medical Center of Delaware, expressed doubts as to whether Mr. Garrett's behavior could be accounted for as a major depressive episode. He could not rule out other possibilities, including a psychotic state, a "character disorder," or a state, (which I took to be a state of an essentially normal mind reacting to grossly abnormal conditions) of "existential despair." Dr. Raskin recited his grounds for entertaining doubt that Garrett could accurately be cast as suffering from depressive illness, although it is uncontestable that Garrett is depressed. Dr. Raskin would recommend a period of deeper study of the situation.

### V.

I am mindful of Mr. Garrett's rights. The horrifying crimes of which Garrett has been convicted have occasioned a massive restriction upon his autonomy that has and will continue. By commonly-held standards, his life is sterile and, for him, its bleakness has surpassed boredom and apparently has become acutely painful. He now seeks, through starvation, to exercise some little control over himself, but the state, which imposes his punishment upon him, would now force him to endure it. There seems, in this result, the possibility of a chilling cruelty.

Of Lear, at his dying, Kent says:

Vex not his ghost: O, let him pass! He hates him
That would upon the rack of this tough world
Stretch him out longer.

*King Lear*, Act V, Scene III. But in this instance this admonition will be resisted. The point on the balance at which justice most surely lies is not easily discerned, but I cannot in good conscience let Mr. Garrett pass, so long as it appears likely, as the testimony suggests, that he may, in five or six months' time, regain some appreciation for life, even as it is lived in a prison. He apparently found that life at least minimally acceptable until recently. I cannot say that the possibility of regaining some im-

pulse for life is illusory or even unlikely. Thus, (1) because there is some basis to hope that the desire to die will itself pass away, and (2) because, even though Mr. Garrett does appear rational, there is also some basis to conclude that his response to the conditions of his life is so extreme as to fall beyond the range of decisions that a healthy mind would make in these or similar circumstances, I conclude that a guardianship of Mr. Garrett's person is appropriate.

Before concluding, I should note the court's appreciation and gratitude to Lawrence Hamermesh, Esquire, who freely undertook the burden of representing Mr. Garrett in this proceeding without hope of compensation. Counsel's responsibility in such a matter is as delicate as it is burdensome and, in this instance, that burden was carried with skill and sensitivity.

Petitioner shall submit an implementing order that will be limited to six months in duration with leave to request an extension upon thirty days' notice.