In the Matter of WINFIELD S. CONNER, SR.,
an Aged and Mentally Infirm Person.

*New Castle, January 18, 1967.*

*Robert B. Walls, Jr.,* Wilmington, for petitioner, Anne Conner Biddle.

*Joseph A. Julian, Jr.,* Wilmington, for Winfield S. Conner, Sr.

DUFFY, Chancellor: This is the decision after final hearing on the petition for appointment of a guardian for Winfield S. Conner, Sr., under 12 *Del.C.* § 3914. The petition was filed by Anne Conner Biddle, daughter of Mr. Conner, on the grounds that her father is unable, because of advanced age or mental infirmity, to properly manage and care for his property. Mr. Conner appeared and opposed the petition.

Mr. Conner is 83 years of age and apparently in good physical condition. He is neat in appearance, courteous in manner, cheerful in disposition, and responsive to questioning. He seems serene, alert and attentive. At trial he testified in detail as to his personal and

professional life with excellent recall of both distant and recent events; on at least two occasions he was called upon to make computations and in the process moved ahead of the questioner.

As a younger man Mr. Conner was involved with several different business enterprises but eventually spent most of his professional life engaged in some phase of bookkeeping or accounting. He is now the owner of assets worth more than $80,000, some of which derive from land inherited about thirty years ago.

Two transactions involving land sales provide the principal evidence in support of the petition. These and medical testimony are the substantive evidence offered to show that age or mental infirmity has put Mr. Conner in a position where he is unable to care for his estate.

Both transactions involved deals with John G. Woolfolk, whom Mr. Conner has known since May or June of 1966. The lands are part of the inherited tract of more than two hundred acres which Mr. Conner owned at or near the southwest corner of the intersection of Routes 40 and 896, New Castle County (Glasgow). Mr. Conner lives on this tract, and out of it from time to time he has conveyed parcels, large and small, to his several children, sometimes for less than fair market value. In June 1966 he still owned about 100 acres of the land.

About June 7, 1966 Mr. Conner entered into two written agreements with Mr. Woolfolk to sell a total of 54.801 acres out of the tract for $21,925, or $400 per acre. A deed conveying this tract was signed on July 6 and recorded the next day.

On August 5, 1966 Mr. Conner made another written contract with Mr. Woolfolk, this time agreeing to sell him about 42 acres at $600 an acre, a total of $25,453. An interim guardian was appointed on September 9, and settlement has not yet been held on this sale.

At trial Robert E. Hickman, a real estate appraiser, testified that on July 7 the 54-acre tract had a fair market value of $82,000, or about $1,500 as against the $400 per acre for which Mr. Conner sold it. As to the second tract, Mr. Hickman testified that on August 5 it had

a fair market value of $55,000, or about $1,300 per acre as against the $600-per-acre price under the Conner-Woolfolk agreement.

Mr. Woolfolk testified as to the availability of land in the Glasgow area at a much lower price per acre. His testimony in general was directed toward showing that the prices he agreed to pay Mr. Conner were close to current market values.

Land values in the Glasgow area have risen generally since April 19, 1966 when it was publicly announced that the E. I. duPont de Nemours & Company had agreed to buy about 600 acres of land at Glasgow. The duPont Company took title to the land in July for a price of about $3,100 per acre. Prior thereto rumor in the community put the price at $2,500 an acre.

As to the two tracts in question, there is a difference of approximately $90,000 between the prices for which Mr. Conner contracted to sell and the fair market values to which Mr. Hickman testified. I am satisfied from the evidence that Mr. Conner knew of the duPont plan to purchase shortly after it became public information and before he contracted to sell the first parcel to Mr. Woolfolk.

The problem is complicated because of a philosophy of life by which Mr. Conner has lived for many years and apparently still follows. According to Dr. Mesrop A. Tarumianz who testified for the petitioner,

"* * * Mr. Conner has a philosophy of Utopia life presently. He doesn't believe within himself—Within himself, he doesn't believe that he should charge market price; that he knows the value of his property from his own viewpoint. Therefore, he doesn't feel that he wants to charge any more regardless. So this is his Utopian philosophy, which is certainly not reasonable for present realistic life.

* * *

"Q. As I understood it, his philosophy, you said, is that he has in his mind what he considers to be a proper value and which may not agree with the present market value, and he wants to disregard the market value and substitute his own judgment?

"A. This is what he told me, definitely; that he doesn't need any more than what he is charging, and he likes to see other people get benefit of his estate; that he has provided sufficiently for his children, and he doesn't need any more than what he is receiving."

Dr. James Flaherty testified on behalf of Mr. Conner as follows:

"Q. Do you think that if he believes that a piece of real estate which cost him nothing and should be sold at a price below the market value, knowing that the buyer would make a profit on it, he would—

"A. Knowing that—

"Q. That the buyer would make a profit on it, do you think that he would sell that real estate at less than market value?

"A. I think if, in his own mind, he placed a value on the property, and if it were below the marketable value, or the market value, I think he would sell it at the price that he felt in his own mind was fair, and the lure of making more money than he felt was just, I don't think this would attract him. Now, this makes him very odd, but not sick. If you sell a house, you want to get the market value for it, but he's not doing this with his daughter. He is selling it below the value placed upon it in the market.

"Q. If he should tell the real estate—Could we be specific? We have had an appraiser testify within the last two hours that what we refer to as Parcel No. 1 of the land—

"A. That's the $1,500 an acre versus $400 an acre?

"Q. Yes.

"A. Yes.

"Q. Now, would you characterize—How would you characterize that if it happened that on July 6th of this year, a property valued at $1,500 on the market was sold to someone of no relation whatever for $400? How would you characterize that?

"A. I would characterize that as quite different than the culturally respected. Now, if I may say this: The man himself has a sense of values from the monetary standpoint, and he has abided by it all his life. From the brief time I talked to him, which, I would say, was two hours or somewhat less—His transaction, to a real estate man or interested peripheral relatives, would be the act of a madman, but to his own conscience, this

would be an act of consistency. When he was taking his pension and his pension was to be a certain amount a month and he said, 'Oh, no, I feel that I can do well with two-thirds of that,' this is the act of a madman considering its context being judged by a person who places value, monetary value, more highly than adherence to an inner code. I guess even Wooleyhan thought there was something a little odd about this."

Mr. Conner's approach to money matters is indicated by his reaction at the time of his retirement from active business in 1961. After a number of years of service, his employer gave him an opportunity to fix his own pension at a monthly figure in the range of $300 to $350. Mr. Conner would take no more than $100 a month because he believed that that sum, coupled with Social Security income, was sufficient to enable him to live comfortably.

The problem before the Court is not to determine whether Mr. Conner entered into unwise, unrealistic or improvident real estate transactions. And the Court is not to scrutinize those transactions for the purpose of determining whether either or both of them may be rescinded for any legal or equitable reason. The Court's duty is to determine whether the transactions and the evidence as a whole call for application of the statute authorizing appointment of a guardian. In considering this, the question arises as to whether the transactions fit into the norm of Mr. Conner's life and his approach to money matters, or whether they are the consequence of age or mental infirmity.

■ Preliminarily, I should note that an improvident business transaction, standing alone, does not warrant the appointment of a guardian. Nor does mere generosity in the disposition of one's property; if it did, the foundation on which much of our community life is based would be substantially shaken.

12 *Del.C.* § 3914(*a*) provides:

"Whenever any person not mentally ill, a resident in this State, by reason of advanced age or mental infirmity or physical incapacity is unable properly to manage and care for his property, and in consequence thereof is in danger of dissipating or losing

such property, or of becoming the victim of designing persons, such person, his mother, father, brother, sister, husband, wife, child, next of kin, creditor, debtor, any public agency or, in the absence of such person or persons, or public agency, or their refusal or inability to act, any other person, may file in the Court of Chancery of the county in which such aged, mentally infirm or physically incapacitated person resides, his petition, under oath, setting forth the facts, praying the Court to adjudge that such person is unable properly to manage and care for his property, and requesting the appointment of a guardian of the property of such person."

■■ This statute was designed to provide a method by which fiduciaries might be appointed for those persons who by reason of age, mental infirmity or physical incapacity are unable to manage their own property, yet who could easily become the victim of designing persons or who are otherwise in danger of dissipating their property. *In re Cain, Del.Orph.*, 108 *A.2d* 578. There is no inherent power in the Court to appoint a fiduciary for these purposes, *In re Cain, supra,* so jurisdiction is derived solely from the legislative enactment. Compare *In re duPont,* 41 *Del.Ch.* 300, 194 *A.2d* 309.

■ In *duPont* Chancellor Seitz held that § 3914(*d*)* was intended to vest this Court with the same powers over the property of aged, mentally infirm, and physically incapacitated persons as it had theretofore exercised over the property of the mentally ill. That same statute provides that "In all matters relating to the *appointment*" (emphasis supplied), the guardian is governed by the applicable law relating to the management of the estates of mentally ill persons. It therefore logically follows that the Court should take the same approach when considering an application for appointment of a guardian under 12 *Del.C.* § 3914 as it does when considering an application for appointment of a trustee for a mentally ill person under 12 *Del.C.* § 3701.

---

* 12 *Del.C.* § 3914(*d*) provides:

"In all matters relating to the appointment, qualification, duties, powers, liability to account, and distribution of property at the recovery or death of the ward, such guardian shall be governed by all of the applicable provisions of law and rules of Court relating to the management of the estates of mentally ill persons."

 The law presumes every person sane and casts the burden of establishing mental illness on the one who asserts it. *Frazer v. Frazer*, 2 *Del.Ch.* 260. A person for whom a property guardian is sought under § 3914 is entitled to the same presumption. Accordingly, Mr. Conner is presumed able to manage and care for his property unless and until the petitioner shows by a perponderance of the evidence that he is not.

 Since the Court's power to appoint a guardian derives solely from the statute, the petitioner must bring her case within it. Where the statute lays down tests to be applied before a guardian is appointed, it is well settled that the statutory language is controlling. 9 *A.L.R. 3d* 781. And in Delaware the Court must be satisfied that the requirements of § 3914(*a*) are met. 12 *Del.C.* § 3914(*c*). In order to bring the statute into play, it is necessary to show that Mr. Conner, "by reason of" advanced age or mental infirmity, is unable properly to manage and care for his property, and in consequence thereof is in danger of dissipating or losing that property or of becoming the victim of designing persons. A causal relationship must be established between inability to manage and care for property, and the advancement of age or mental infirmity. Without such causal relationship the statutory requirement is not met and the Court is without power to act.

I turn now to the evidence.

Accepting Mr. Hickman's valuations, as I do, there is a wide and shocking disparity between the fair value of the lands and the prices to which Mr. Conner agreed to sell them to Mr. Woolfolk. But the evidence as to valuation *vis-a-vis* price does not directly show a causal relationship between advanced age or mentally infirmity and inability to manage property; any such conclusion would have to be inferred from the comparative arithmetic. But the Court is not called upon to determine "how much" of an inference should be drawn from the arithmetical evidence alone because there is other evidence, including medical testimony, which sheds light on the causation issue and which helps explain why Mr. Conner did what he did.

Dr. Tarumianz testified that Mr. Conner is "not capable of managing adequately his estate, nor has he sufficient reasoning powers not to be led easily into economic catastrophe". This is based in part on

a finding of impairment of memory, particularly as to recent events. But Dr. Rublee C. Soule testified that Mr. Conner's memory as to recent events was "quite good". And Dr. Flaherty testified that "Mr. Conner's memory on a quantitative basis for factual information tests superior" as did his memory of recent events. Mr. Conner's own testimonial evidence confirms that conclusion.

A review of Dr. Tarumianz' testimony shows that in arriving at his judgment of Mr. Conner he was not applying the statutory standards by which the Court is bound. He testified, for example:

"Q. Do you have an opinion as to whether he is able properly to manage and care for his estate?

"A. If I may say this, not according to our present philosophy of life, he could not.

\* \* \*

"Q. Now, isn't this the same sort of pattern that he has now? His pattern, as you state, is that all he needs for himself is a certain amount of money. He doesn't need any more. Therefore he should not try to get more.

"A. Well, this was perfectly all right when he was young. Any man can have his own philosophy about life, but now he has reached the point that sooner or later he is going to be the ward of the State if he doesn't have some security of his own, because he certainly could not exist comfortably on a $100-pension.

\* \* \*

"A \* \* \* the man's reasoning is not logical. His reasoning is not according to the yardstick of standards of this planet. Now, in some other planet, it might be so. But he says, 'I am putting the price.' I said, 'But you cannot. There is such a thing as market price. If you put your own price, you might just as well say that 50 years ago, that property was worth only $50 an acre or $100 an acre. You can't put the price for yourself. You have to act according to market price.' Well, he says, 'After all, I want my friends to get some benefit of this.'

"Well, if he wants to give it as a gift, which apparently he does—The man is trying to say, 'I'm trying to give this particular individual the benefit of the value of the land that today is worth more than $600.' So there is no logic.

"Q. There is nothing wrong with that. There is nothing wrong with making a gift of it to anybody. That wouldn't say that his logic was wrong, would it?

"A. Well, I think the family may revolt; that the man doesn't have good common sense to use judgment; that he has certain responsibilities in this world about his family, about his close, intimate members of the family, et cetera, et cetera. Besides, how do I know that this man is not going to live to be 130 years?

"Q. That's right.

"A. How do you know that he is not going to live to be 150 years? Science might progress to the point that life would be prolonged. Will he then be able to continue living comfortably under those circumstances?

\*　\*　\*

"Q. Well, Doctor, could he have just as easily been swayed to give away the $18,000 when he was a younger man, according to his philosophy, as easily as he is now?

"A. Well, I answered you that question, if I may say. I said that when he was young, he had opportunities to make it up. He doesn't have opportunities to make it up now. He can't go and obtain a job and get $300 or $400 a month salary. He doesn't have that opportunity.

"Q. But he still does have the same philosophy?

"A. His philosophy has remained."

Measured by the tests which Dr. Tarumianz applied, Mr. Conner is not capable of managing his own property, but his testimony does not establish the necessary causal relationship which the Court must find in order to warrant invocation of the statute.

Adherence to a long-held philosophy was also a point made by Dr. Flaherty. He said:

"\* \* \* inability to change, I suppose, is one of the normal aspects of growing old. However, in the matter of his [Mr. Conner's] pension, in the matter of the real estate, he was abiding by a set philosophical attitude that goes back to the days when nobody could question his intellectual integrity or his judgment. He is oriented not to the past, but to the future and to now. The

fact that he is making judgments that are not congruent with our competitive business practices, this may be true, but it is not an evidence of senility in a sick sense, in a psychotic sense."

Dr. Soule testified in support of the petition, and he stated that from a certain standpoint Mr. Conner is not capable of handling the major transactions of conserving an estate. But nowhere in his testimony is there a finding that this is brought about by the statutory requirements of advanced age or mental infirmity. On the contrary, Dr. Soule's testimony on cross-examination indicates that he likewise was measuring Mr. Conner by what a prudent man of affairs would do in similar circumstances—consult with a real estate agent or have the property appraised, for example.

As to "changes" in Mr. Conner, Dr. Soule testified that these were "minor" over a seven-month period in 1966 and that over many years Mr. Conner had not "actually changed his values".

■ Tested by prevailing community standards, and as explained by the psychiatrists who testified, Mr. Conner's agreements as to the transactions with Mr. Woolfolk have an "out-of-this-world" quality reminiscent of *Miracle on 34th Street*. Or the transactions may reflect a regrettable indifference toward adding to the assets of his issue. But the Court cannot base property guardianship only on the generous—or perverse—conduct of an old man any more than it can on that of a young man. An old man is just as entitled to his generosity, and his perversity, as a young man. The Court is empowered to act only when such conduct is a product of age or mental infirmity.

Here that is not the case.

■ On the contrary, Mr. Conner's conduct is consistent (and there is no dispute about this among the witnesses) not only with his personal philosophy but with his history as well. During his employment, for example, he was offered a pay raise which he refused because he was already getting paid enough to live comfortably. He suggested that his employer use the money to raise the salaries of *other* people in the office. Then, about six years ago, he would accept only a third of a pension which he had presumably earned and to which he was entitled. There was perhaps even more reason for Mr. Conner to take all of the pension than there was to get market values in the

land transactions because apparently he earned the pension—he inherited the land. But he refused the $350 and the $300 and took only the $100 a month.

Dr. Tarumianz said of Mr. Conner that he is a "very fine man. I have seen very few men like him in all my experience. He is a man out of this world, almost." My own conclusion is that Dr. Tarumianz accurately analyzed Mr. Conner's reasoning when he testified:

> "I think that there has been suggestion to start with, your Honor, and then he has created within himself the idea, 'Why should I charge any more? I don't need any more. I have sufficient to exist comfortably.' This has been constantly his answer to all my questions: 'Doctor I have provided for my children sufficiently. They are all well fixed. I don't need any more than a few hundred dollars a month to live on, and I have provided for my second wife sufficiently for her to exist.' As I said, his philosophy is a Utopian philosophy."

> And Dr. Flaherty's testimony generally confirms this:
> "* * * He knows what he has, and in the selling of the property that he has, he knows what he is selling it for. He told me what he could get for it, and he told me that this simply didn't fit into his philosophy."

And very significant is the testimony of Mr. Conner's son, Linwood A. Conner, who sat through the hearing and who asked for an opportunity to testify in support of the petition. He said that in the latter half of August, when he spoke to his father about the second transaction, he asked him about the price, and asked his father to verify that it was sold for only $600 an acre. He wanted to know why his father did not get more than that:

> "Q. And did you ask him why he didn't get more?
> "A. I did certainly ask him why he sold it for such a low price.
> "Q. Did he make a reply to you?
> "A. During our talk of this situation, he said that he didn't want any more money; that too much money made trouble.
> "Q. That's what your father told you in answer to your question?
> "A. This is correct."

"Too much money made trouble" is a common observation often made of others, rarely of one's self. Mr. Conner has apparently applied it to himself for a long time.

Courts in many jurisdictions have considered an application for appointment of a guardian under involuntary circumstances in a wide spectrum of social, medical and financial facts. See the perceptive discussion of Involuntary Guardianship in 73 *Yale Law Journal* 676 and the annotation at 9 *A.L.R.3d* 774.

Without considering the significant question of statutory differences, some of the cases are readily distinguishable on their facts, as are many of those relied upon by the petitioner: such cases include those in which the would-be ward has a history of inability to manage his affairs (*In re Shepherd's Estate,* 391 *Pa.* 102, 137 *A.2d* 298), or who is wholly out of touch with reality (*Shelby v. Farve,* 33 *Okl.* 651, 126 *P.* 764), or who is unaware of even the simplest details as to his business affairs (*In re O'Connor's Guardianship,* 239 *Wis.* 410, 1 *N.W.2d* 873). In other cases the Court reasoned back from an improvident transaction to a finding of mental infirmity, a result which is, in this case at least, neither permissible under the statute nor desirable under the evidence. But other cases are probably not distinguishable in principle and, as to these, I can only say that I do not find them persuasive in performing this Court's duty under our statute.

The petition for appointment of a guardian will be denied and the order heretofore entered appointing a temporary guardian vacated.

Order on notice.