**In the Matter of the GUARDIANSHIP OF Robin Andrea POLIN.**

**No. 60342.**

Supreme Court of Oklahoma.

Nov. 29, 1983.

As Corrected On Denial of Rehearing Jan. 30, 1984.

John M. Young, Young & Young, Sapulpa, for appellant.

Don E. Gasaway, Gasaway, Green & Harris, Tulsa, for appellees.

BARNES, Chief Justice:

Paul and Marsha Polin brought an action in Oklahoma District Court for Tulsa County in which they sought a judicial declaration that their eighteen year old daughter, Robin, was incompetent under 58 O.S.1981 §§ 851–852. The only allegations of incompetency consisted of statements in the petition that Robin Polin is "socially naive", is being "brainwashed, programmed and secreted by members of a religious sect called Kingdom Come Ministery", and is being "deceived and imposed upon by artful, deceiving and designing persons."

The testimony and evidence presented during the five day trial demonstrated that Robin Polin is eighteen years old and is congenitally deaf. She cannot speak and communicates in her primary language which is a combination of American Sign Language and signed English. Robin is

bilingual; her second language is written English. Additionally Robin possesses above average intelligence as demonstrated by the evidence presented by both petitioners and respondents.

Robin's academic achievement level does not equal that of eighteen year olds who are not hearing impaired, primarily because of the communication problems with which she is faced. Yet, in spite of the serious communication difficulties which face all deaf persons, Robin's academic plans include graduating from high school and continuing on to college.

Robin is a registered voter, a licensed driver, and has demonstrated her ability to travel independently. She has held part-time jobs during summer vacations like many high school students.

While attending Edison High School, Robin became acquainted with other deaf students. Through social activities with her friends, Robin became curious about Christianity, and sought information from an established Tulsa church with an active ministry to the deaf. Robin's parents, having raised her according to her Jewish heritage, objected to her association with the Christian ministry. They wanted her to adhere to Jewish beliefs and felt that they should answer any religious questions posed by their daughter. Open conversation was difficult however, since Paul Polin, throughout the eighteen years of his daughter's life, never learned to communicate with Robin in her primary language, signed English.

Between March, 1982 and April, 1983, Robin made the decision to adopt the Christian faith as her own, and sought to combine this faith with her ethnic heritage. Mr. Polin opposed Robin's choice, and ordered his daughter either to conform to his wishes or leave his home. Robin chose to leave on April 26, 1983. On April 28, 1983 Mr. and Mrs. Polin petitioned to have their daughter declared incompetent and sought guardianship of her person and estate.

After a five day trial Special Judge Robert D. Frank found Robin Andrea Polin to be "judgmentally immature" and therefore incompetent under the laws of Oklahoma. In his lengthy decision, Judge Frank observed that the apparent motive in bringing the action was the discord surrounding Robin's religious choice. Yet, in outlining the factors which did *not* contribute to his decision, Judge Frank listed religious choice first, followed by Robin's average to above average intelligence, her academic achievement level, and her employability.

The sole effect of the creation of "judgmental immaturity" as a standard by which to judge one incompetent to manage her person or property manifests itself as an abridgment of Robin Polin's constitutionally guaranteed right to free exercise of her religious beliefs. These beliefs were characterized in Judge Frank's decision as a "vague and persistent desire to serve the Lord." Yet careful scrutiny of the five volume transcript reveals Robin's beliefs as consistent and specific ideals which have motivated her to desire a career as a Christian minister to the deaf. Thus, this case, prompted by familial disagreement, resulted in misconstruction of Oklahoma's incompetency statutes and in an intolerable chilling of a fundamental constitutional right.[1]

Section 852 of Title 58 of the Oklahoma Statutes governs appointment of a guardian for an incompetent person. It provides:

> If after a full hearing and examination upon such petition, it appears to the judge of the county court that the person in question is incapable of taking care of himself and managing his property, he must appoint a guardian of her person and estate, with the powers and duties in this article specified.

This statute has been in effect in virtually the same form since 1910, and has been construed in a variety of cases during its existence. The primary purpose of this statute has been to protect people from

---

1. U.S. Const. amend. I (applicable to the states through the fourteenth amendment); Okl. Const. art. I § 2.

dissipating the assets of their estates by virtue of incapacity, and to protect these incapable of managing their affairs from being victimized by others desirous of depriving them of their property. Additionally, the statute protects persons who for any reason cannot make day-to-day decisions required of them in order to function within our society.

The trial court, as well as both appellant and appellees in this case make much of the "artful and designing persons test" which we applied to deny appointment of a guardian for a woman alleged incompetent because she married a man thirty-five years her junior, contributed large sums of money to his filmmaking project and on occasion gave rather extravagant gifts. *In the Matter of the Guardianship of Bogan,* 441 P.2d 972 (Okl.1968). In *Bogan,* we applied 58 O.S.1961 § 852 and defined "incompetent" and "incapable" to mean

> any person who, though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause, unable or incapable, unassisted, of properly taking care of himself or managing his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons.

*Id.* at 974 (quoting *In re Guardianship of Prince,* 379 P.2d 845 (Okl.1963)).

We adopted this definition in 1912 as dispositive of the Legislature's intent to protect *property* of alleged incompetants from being usurped by artful and designing persons. This definition existed as part of the language of California's incompetency statute. We applied it in order to uphold appointment of a guardian for two sisters who were "so ignorant in so far as the value of their property was concerned that it was probable they would make an improvident disposition thereof...", and ruled that protection of property "is the situation contemplated by the statutes under which this proceeding was brought." *Shelby v. Farve,* 33 Okl. 651, 126 P. 764 (1912). We will not permit application of this definition beyond these parameters

when such application invades the area of personal ideas, thoughts and beliefs.

Indeed, the very language adopted from the California statute was declared unconstitutional in an appeal from a conservatorship proceeding in which the California Court of Appeal held that application of the statute to facilitate "deprogramming" of young adults abridged the right to free exercise of religious beliefs. *Katz v. Superior Court of City and County of San Francisco,* 73 Cal.App.3d 952, 141 Cal. Rptr. 234 (1977). The court held that "although the words 'likely to be deceived or imposed upon by artful or designing persons' may have some meaning when applied to the loss of property, they are too vague to be applied to the world of ideas." *Id.* at 970, 141 Cal.Rptr. at 244.

We need not reach the issue of constitutionality of the Oklahoma statute as urged by the appellant since our statute does not contain the language held unconstitutionally vague by the California court. Under Oklahoma law, the artful and designing persons test applies *only* to cases in which appointment of a guardian is necessary to protect an incompetent person from losing *property* to deceitful persons, and may not be applied to force an unconstitutional construction upon a constitutional statute.

A better definition exists by which to test incompetency. We dismissed a guardianship proceeding where the only evidence of "artful and designing" influence was inequality of bargaining power in a loan transaction and being cheated by a tenant. We observed that

> [b]eing cheated out of our rents and being charged an exhorbitant rate of interest is neither a new or novel experience to landlords or borrowers in this or any other state in the United States, and is not evidence of incompetency. If it were, the bulk of the business of this country would be conducted by guardians.

*In re Winnett's Guardianship,* 112 Okl. 43, 239 P. 603, 605 (1925). The following test for competency evolved in *Winnett.*

Mental incompetency or incapacity is established when there is found to exist an essential privation of the reasoning powers or faculties, or where a person is incapable of understanding and acting with discretion in the ordinary affairs of life. When it is not shown that such mental incompetency exists, it is reversible error for the court to appoint a guardian of the estate of an adult person.

*Id.*

Thorough examination of the transcript in this case reveals that the trial court's characterization of Robin Polin as being "judgmentally immature" will withstand neither the artful and designing persons test nor the *Winnett* test, nor will it withstand scrutiny under the statutory language of 58 O.S.1981 § 852. Robin Polin does not have financial assets capable of being depleted by artful and designing persons, and the evidence clearly illustrates that Robin is "capable of understanding and acting with discretion in the ordinary· affairs of life." Additionally, the statute requires that the alleged incompetent be "incapable of taking care of himself and managing his property", and sets a standard much higher than mere "judgmental immaturity". 58 O.S.1981 § 852. That she needs additional training and guidance as she continues to mature shows nothing more than the needs for experience, training and guidance exhibited by all young adults. Robin's needs differ because of her disability, but Robin understands her special needs and has been trained to cope with her communication difficulties. She knows when and how to seek appropriate aid when she requires special assistance.

The trial court's creation of a vague standard such as "judgmental immaturity" cannot be permitted as camouflage for the single effect of its decision, the denial of Robin Polin's right to her religious beliefs. To permit this standard to exist places a construction upon our statute beyond the intent of its drafters and well outside the limits of the Oklahoma and United States Constitutions.

The Tenth Circuit held a guardianship proceeding void for lack of notice under 58 O.S.1981 § 851 when the intent of the proceeding was to facilitate deprogramming of a young adult. The court remanded for trial the tort claims of the alleged incompetent for false imprisonment, holding that the case arose from a "situation in which there is a gross concerted interference with a very fundamental right, the right to choose one's religion, and it is this underlying factor that makes the case actionable, or which greatly aggravates it." *Taylor v. Gilmartin*, 686 F.2d 1346, 1362 (10th Cir. 1982); *cert. denied*, ── U.S. ──, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983).

A similar misuse of the Oklahoma incompetency statutes is effected by the trial court's decision against Robin Polin. The decision is therefore REVERSED.

IRWIN, LAVENDER, DOOLIN and OPALA, JJ., concur.

SIMMS, V.C.J., concur in judgment.

HARGRAVE and WILSON, JJ., concur in result.

HODGES, J., dissent.