944 F.2d 911
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Paul William POLIN, Plaintiff-Appellant,
Marsha Polin, Plaintiff,
v.
JEWS FOR JESUS, aka Hineni Ministries, Defendant-Appellee.
 No. 88-2031.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 16, 1991.
 
 Before HOLLOWAY, Chief Judge, and SETH and BARRETT, Circuit Judges.
 ORDER AND JUDGMENT*
 BARRETT, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); Tenth Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 Paul William Polin (Polin) appeals from an order of the district court granting summary judgment in favor of Jews for Jesus (JFJ). Polin initiated this diversity action by suing JFJ for damages under the Oklahoma tort of invasion of privacy/false light following JFJ's publication of three articles[1] relating to the guardianship trial of Polin's daughter, Robin.
 
 
 3
 Robin is the congenitally deaf child of Paul and Marsha Polin. The Polins are Jewish. They did not raise their daughter to be a Christian. After Robin became a believer in Jesus, the Polins gave her an alternative to either obey their wishes or leave home. Robin subsequently left home. Thereafter, Polin filed a guardianship hearing in which he claimed that Robin was incapable and incompetent to handle her affairs and estate and that she was being deceived and imposed upon by artful, deceiving and designing persons. (R., Order, June 3, 1988, p. 2).
 
 
 4
 During the guardianship hearing, which was widely covered by the news media, there was conflicting testimony as to Polin's treatment of Robin and Polin's physical confrontation with Robin.[2] During the hearing Robin testified that she did not want to go to Boston as suggested by her father because she feared that her father's friends would kidnap her. Robin was subsequently found to be judgmentally immature and incompetent under Oklahoma's guardianship statute. On appeal, the Supreme Court of Oklahoma reversed with directions to vacate the order appointing a guardian and to dismiss the action. Thereafter, Polin sued JFJ for damages alleging that the JFJ articles relating to the guardianship trial had cast him in false light.
 
 
 5
 Prior to trial, JFJ moved for summary judgment. During the motion hearing, the parties agreed to submit the matter to the court for determination while reserving objections to various exhibits. Counsel for Polin conceded that the publicized matter was true, and that Polin had to prove actual malice under Oklahoma law to prevail on his false light claim. Thereafter, the court, in a detailed order, granted summary judgment in favor of JFJ, finding that truth was an absolute defense to Polin's action. The court also found that it was not necessary to rule on the objections to the exhibits because none of the exhibits demonstrated that the publications were false.
 
 
 6
 On appeal, Polin contends: (1) the false impression given by the articles gave rise to a false light cause of actio; (2) the defense of truth applies to the truth of the impression of the articles; (3) the court erred in its analysis of the elements of false light under Oklahoma law; (4) the court's findings of fact and conclusions of law were not based on the evidence submitted; (5) the court erred in finding that none of the exhibits demonstrated that the publications were false; (6) the First Amendment freedom of the press does not give JFJ right to publish a one-sided biased report of a judicial proceeding for the purpose of influencing the public and a judge for its own personal gain; and (7) assuming that the First Amendment freedom of the press permits malicious, biased, selective editing by the news media of accounts of judicial proceedings, this "constitutional safeguard" should not apply to the non-media defendant.
 
 
 7
 We have carefully reviewed Polin's contentions on appeal and hold that they are without merit. The summary judgment order of the district court was based on undisputed facts. Polin's counsel conceded that the publicized matter was true. Under the law of Oklahoma, truth is an absolute defense in an invasion of privacy/false light action.
 
 
 8
 We AFFIRM the district court's order and judgment, substantially for the reasons set forth in its Order of June 3, 1988, which is attached hereto.
 
 
 9
 We AFFIRM.
 
 
 10
 Judge Holloway may file a separate opinion.
 
 ATTACHMENT
 
 11
 IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
 
 DISTRICT OF OKLAHOMA
 
 12
 Paul William Polin, Plaintiff,
 
 
 13
 v
 
 
 14
 Jews for Jesus a/k/a Hineni Ministries, Defendant.
 
 No. 87-C-38-C
 June 3, 1988
 ORDER
 
 15
 This matter came on for hearing before the Court on February 18, 1988, on the motion of the plaintiff for summary judgment. During the hearing, both parties agreed to submit the matter to the Court for determination, while reserving objections to various exhibits. The Court now enters its Order in regard thereto.
 
 
 16
 The parties submitted a joint statement of undisputed facts, which the Court recites below:
 
 
 17
 1. Robin Polin is the congenitally deaf child of Paul and Marsha Polin.
 
 
 18
 2. Mr. and Mrs. Polin are Jewish. They did not raise their daughter to be a Christian.
 
 
 19
 3. Robin became eighteen (18) years of age on December 27, 1982.
 
 
 20
 4. Robin became a believer in Jesus in 1982.
 
 
 21
 5. Robin was reluctant to tell her parents about her faith in Jesus.
 
 
 22
 6. In mid-April 1983, Paul removed the coupling device to Robin's TTY machine, did not allow her to use the car, and removed the captioned device to the television in Robin's bedroom.
 
 
 23
 7. Robin was allowed to attend school during this period in April, 1983.
 
 
 24
 8. On April 22-23, 1983, Robin's parents gave her ultimatums to obey their wishes or to leave home. Attached [to the parties' submitted statement were] copies of the ultimatums and exchanges.
 
 
 25
 9. On April 25, 1983, Robin ceased living in her parents' home.
 
 
 26
 10. Paul and Marsha went to the Tulsa Police and stated that their daughter was missing. The report states that the Polins tried to file kidnapping charges.
 
 
 27
 11. Paul filed a guardianship proceeding in the District Court of Tulsa County, case No. PG 83-76, styled "In the Matter of the Guardianship of Robin Andrea Polin".
 
 
 28
 12. The guardianship Petition claimed that Robin was incapable and incompetent to handle her affairs and estate, and that she was being deceived and imposed upon by artful, deceiving and designing persons.
 
 
 29
 13. A hearing in the guardianship case was held between the dates of May 5-12, 1983.
 
 
 30
 14. During the guardianship proceeding, there was conflicting testimony concerning the reason why Paul removed the coupling device to Robin's TTY machine, did not allow her to use the car, and removed the captioned device to the television in Robin's bedroom.
 
 
 31
 15. During the guardianship proceeding, there was conflicting testimony concerning the nature and cause of the physical confrontation between Paul and Robin. Robin testified that her father hit her in the mouth with his knuckles. Paul said he hit her with the back of his hand in self defense.
 
 
 32
 16. During the guardianship proceeding, there was conflicting testimony by Robin and Paul concerning their discussions about Jesus.
 
 
 33
 17. Paul has had no formal training in sign language.
 
 
 34
 18. During the guardianship proceeding, the testimony was conflicting concerning Robin's ability to adequately communicate in writing.
 
 
 35
 19. During the guardianship proceeding, Robin stated that she did not want to go to Boston because she feared that her father's friends would kidnap her.
 
 
 36
 20. There was conflicting testimony in the guardianship proceeding concerning the nature and reasons for the Boston trip.
 
 
 37
 21. Prior to the hearing, Paul told Susan Perlman in a telephone conversation his view of the reasons for the Boston trip. Robin told Susan Perlman her view of the reason for the Boston trip. Susan Perlman and Moishe Rosen had independent knowledge of the Our Way organization in Boston.
 
 
 38
 22. On May 12, 1983, the Judge assigned to the guardianship case found Robin to be "Judgmentally Immature" and incompetent under the Oklahoma guardianship statutes.
 
 
 39
 23. Attorney John Mark Young, who represented Robin during and after the guardianship proceeding, told Moishe Rosen and Susan Perlman about the hearing.
 
 
 40
 24. Moishe Rosen reviewed transcripts of the guardianship proceedings, newspaper accounts, and talked and listened to Susan Perlman, Donna Hull, and attorney John Mark Young and others prior to publication of the May 12, 1983 letter and the May 18, 1983 advertisement. Susan Perlman related to him Robin's views and statements.
 
 
 41
 25. The Polin matter, Robin leaving home, the guardianship proceedings, etc. was widely covered in the news media. Attached [to the parties' statement were] copies of some of the news articles published in the Tulsa papers and reviewed by Moishe Rosen prior to the May 12, 1983 letter and the May 18, 1983 advertisement.
 
 
 42
 26. Moishe Rosen, Executive Director of Jews for Jesus, mailed a letter to all of the Jews for Jesus supporters in Oklahoma (approximately 2,200) on May 12, 1983. A true and correct copy of that letter and one of the envelopes used for its dissemination [was] attached [to the parties' statement].
 
 
 43
 27. Moishe Rosen authored the newspaper advertisements published by Jews for Jesus in the Tulsa World and Tulsa Tribune on May 18, 1983, a true and correct copy of which [was] attached [to the parties' statement].
 
 
 44
 28. The statements in the May 12, 1983 letter and the May 18, 1983 advertisements are substantially the same.
 
 
 45
 29. The Supreme Court of Oklahoma on November, 29, 1983, reversed the decision of the Trial Court with directions to vacate the order appointing [a] guardian and to dismiss the action. [ Matter of Guardianship of Polin, 675 P.2d 1013 (Okla.1983), cert. denied, 469 U.S. 850 (1984).]
 
 
 46
 30. In 1984, Jews for Jesus published an article in its newsletter, authored by Susan Perlman, entitled Robin's Story, A Happy Ending. The newsletter was distributed to Jews for Jesus supporters throughout the United States. A true and correct copy of the article [was] attached [to the parties' statement].
 
 
 47
 31. Susan Perlman, who had been in Tulsa during part of the guardianship proceedings, reviewed transcripts of those proceedings, newspaper accounts, and talked and listened to Robin, Donna Hull, and attorney John Mark Young and others, including Moishe Rosen, prior to publication of Robin's Story, A Happy Ending in 1984.
 
 
 48
 32. At all times material hereto, Moishe Rosen and Susan Perlman were employees of defendant and were acting within the course and scope of their employment with defendant.
 
 
 49
 A general discussion of this area of the law is necessary in order to place the case at bar in proper context. A relatively recent legal development is the judicial recognition of a right of privacy, with attendant tort actions for invasion of that right. In Munley v. ISC Financial House, Inc., 584 P.2d 1336 (Okla.1978), the Supreme Court of Oklahoma first recognized a cause of action for invasion of privacy. In McCormack v. Okla. Pub. Co., 613 P.2d 737 (Okla.1980), the same court specifically addressed what has come to be known as a "false light" cause of action. Specifically, the court quoted the elements set forth in § 652E of the Restatement of the Law of Torts (Second), as follows:
 
 
 50
 One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
 
 
 51
 (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
 
 
 52
 (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
 
 
 53
 Id. at 740 (emphasis added). Concurrently with this development in Oklahoma tort law, the United States Supreme Court has addressed the constitutional implications of a "false light" claim. The Supreme Court first addressed the parameters of such a claim in Time, Inc. v. Hill, 385 U.S. 374 (1967). In a suit under a New York privacy statute, the Court held that the "actual malice" standard of New York Times v. Sullivan, 376 U.S. 254 (1964), requiring "proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth," applied to such a claim. Hill, supra, 385 U.S. at 388. In Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), the Supreme Court ruled that the "actual malice" standard did not apply in a libel action brought by a private individual. The Court stated that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Id. at 347. The Gertz decision necessarily raised the issue of whether the Hill decision remained sound, i.e., whether the "actual malice" standard still applied in false light cases. The Court mentioned the issue in Cantrell v. Forest City Publ. Co., 419 U.S. 245 (1974), but ruled that it need not decide it under the facts of that case. Id. at 250. The issue has yet to be resolved by the Supreme Court.
 
 
 54
 In Time, Inc. v. Firestone, 424 U.S. 448 (1976), a decision upon which the plaintiff in the case at bar heavily relies, a libel action was brought after a magazine reported that a divorce had been granted on grounds of extreme cruelty and adultery, when in fact the state court had not stated those grounds. The Supreme Court applied the Gertz standard, rather than the New York Times "actual malice" standard, finding that the plaintiff was not a "public figure" nor was the divorce a "public controversy". At oral argument, plaintiff's counsel referred to passages from Firestone in relation to his argument concerning liability for failure to publish a "fair and true" report of a judicial proceeding. While the Court rejects that argument, as explained below, the Court recognizes that these same passages would form the basis for an argument that the "actual malice" standard does not apply in a false light case. One treatise has concluded that "[t]he rationale of Firestone should indicate that Time v. Hill no longer governs the standard for 'false light' privacy suits which cause the plaintiff mental anguish and humiliation." 3 R. Rotunda, J. Nowak & J. Young, Treatise on Constitutional Law: Substance and Procedure, § 20.35 at 182 (1986).
 
 
 55
 The Supreme Court of Oklahoma disagrees. In Colbert v. World Publ. Co., 747 P.2d 286 (Okla.1987), the court held that the Hill "actual malice" standard still applied in false light cases. Id. at 291.[1] It is against this doctrinal background that the parties presented their arguments to this Court.
 
 
 56
 Plaintiff has referred to 12 O.S. § 1443.1, which provides in relevant part as follows:
 
 
 57
 A. A privileged publication or communication is one made:
 
 
 58
 .............................................................
 
 
 59
 ...................
 
 
 60
 * * *
 
 
 61
 Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, falsely imputes crime to the officer so criticized.
 
 
 62
 B. No publication which under this section would be privileged shall be punishable as libel.
 
 
 63
 He has also referred to § 611 of the Restatement of Torts (Second), which provides:
 
 
 64
 The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.
 
 
 65
 The plaintiff's argument apparently is that the defendant's publications were not a "fair and true report" of the judicial proceedings involving the plaintiff, demonstrating "reckless disregard" or "actual malice", and that defendant is therefore liable.
 
 
 66
 The Court has concluded that the plaintiff's reliance upon these provisions as the sole source of defendant's right to publish is misplaced. As § 1443.1(B) indicates, a finding that a publication comes within the ambit of the statute mandates a conclusion that the publication is privileged and that no liability may be imposed. It does not follow, however, that a finding that a publication does not fall within the statute mandates a conclusion that liability must be imposed. The issue of privilege is a separate protection, but the constitutional burden of proof must still be met. See Restatement of Torts (Second), § 611, comment b; see also Ricci v. Venture Magazine, Inc., 574 F.Supp. 1563, 1571 (D.Mass.1983). Therefore, as plaintiff conceded at oral argument, the "actual malice" standard must still be applied in Oklahoma.
 
 
 67
 The difficulty presented by the Colbert decision is the focus of the "actual malice" or the "reckless disregard". The Supreme Court of Oklahoma made the following statement:
 
 
 68
 We have previously considered the test by which recovery of this sort is to be measured, and have adopted the Restatement view--that the defendant must have knowledge of, or act in reckless disregard as to the falsity of the publicized matter or the false light in which another would be placed. This is the equivalent of the Hill teaching that actual malice must be proven with convincing clarity by showing that the defendant had a high degree of awareness of probable falsity or in fact entertained serious doubts as to the truth of the publication.
 
 
 69
 Colbert, 747 P.2d at 291 (emphasis added) (footnote omitted). The court in Colbert stated that it was adopting the Restatement view, which it had quoted previously from the McCormack decision. See Colbert, 747 P.2d at 290. However, the statement from Colbert quoted above is not the Restatement view. The Restatement says, and was quoted in McCormack as saying, that the actor must have had knowledge or acted in reckless disregard as to (1) the falsity of the publicized matter and (2) the false light in which the other would be placed. The Colbert court replaces the "and" with "or", indicating that reckless disregard either toward falsity or false light is sufficient for liability. This distinction is critical in the case at bar because the plaintiff has conceded that the publicized matter was true, but argues that the intentional selection of certain items coupled with exclusion of other items, resulted in the placing of the plaintiff in a false light.
 
 
 70
 The United States Court of Appeals for the Tenth Circuit, in discussing § 652E, the same Restatement section addressed in Colbert, said that "essential to both a false light privacy claim and a defamation claim is a determination that 'the matter published concerning the plaintiff is not true'." Rinsley v. Brandt, 700 F.2d 1304, 1307 (10th Cir.1983). Similarly, in Machleder v. Diaz, 801 F.2d 46 (2d Cir.1986), the court said that "falsity must be shown to state a false light cause of action." Id. at 53. The plaintiff in Machleder argued that a broadcast television interview had been selectively edited so as to tend to portray plaintiff as impliedly admitting guilt over an improper toxic waste dump. The court rejected this argument, stating that
 
 
 71
 recovery for a false light tort may not be predicated on a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast the plaintiff in a more favorable or balanced light. To permit recovery in such circumstances violates the First Amendment since "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials--whether fair or unfair--constitute the exercise of editorial control and judgment."
 
 
 72
 .............................................................
 
 
 73
 ...................
 
 
 74
 * * *
 
 
 75
 A court cannot substitute its judgment for that of the press by requiring the press to present an article or broadcast in what the court believes is a balanced manner. It may only assess liability when the press so oversteps its editorial freedom that it contains falsity and does so with the requisite degree of fault.
 
 Id. at 55 (citations omitted).[2]
 
 76
 Counsel for the plaintiff stated at the hearing that the statements contained in the defendant's publications were true.
 
 
 77
 THE COURT: Then what you're saying is not what was published was false, but that the total story wasn't published that gave the false impression, that is what you're saying.
 
 
 78
 MR. HARLAN: Yes, that's correct.
 
 
 79
 THE COURT: All right. So that which was published is not what you are objecting to; it's the fact that it was published without the full story being told.
 
 
 80
 MR. HARLAN: Yes, oh, yes.
 
 
 81
 (Transcript, p. 13 LL. 17-24). In a false light privacy action, truth is an absolute defense. Rinsley v. Brandt, 700 F.2d 1304, 1307 (10th Cir.1983). Accordingly, the Court must conclude that the defendant has established its defense to the plaintiff's action, and therefore that judgment must be entered in favor of the defendant. The Court need not rule upon the objections to exhibits because none of those exhibits demonstrate that the publications were false.
 
 
 82
 It is the Order of the Court that the motion of the plaintiff, Paul William Polin, for summary judgment is hereby DENIED.
 
 
 83
 It is the further Order of the Court that judgment is hereby entered in favor of the defendant, Jews for Jesus a/k/a Hineni Ministries.
 
 
 84
 IT IS SO ORDERED this 3rd day of June, 1988.
 
 
 85
 /s/H. DALE COOK
 
 Chief Judge, U.S. District Court
 
 
 *
 This Order and Judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 The articles included a letter, an advertisement, and a story
 
 
 [2]
 Number 15 of the parties' joint statement of undisputed facts provides in part:
 Robin testified that her father hit her in the mouth with his knuckles. Paul said he hit her with the back of his hand in self defense.
 (R., Order, June 3, 1988, page 3).
 
 
 [1]
 Neither party has noted that a federal court is not bound by state court determinations of what the Constitution requires. Southwest Offset, Inc. v. Hudco Pub. Co., Inc., 622 F.2d 149, 152 (5th Cir.1980). The law of defamation is a constitutional issue intimately related to the common law. The Supreme Court has granted states freedom in establishing standards of fault in defamation actions. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974). However, under the facts of the case at bar, this Court need not determine whether Colbert was correctly decided
 
 
 [2]
 The fact that the Machleder court refers to a media defendant raises the issue of the viability of a media/non-media distinction in cases of this type. The issue has not been definitively resolved. Compare Garcia v. Bd. of Educ., 777 F.2d 1403, 1409-1411 (10th Cir.1985) (rejecting distinction regarding criticism of local government in libel action and quoting supporting language from Supreme Court decisions) and Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 779 n. 4 (1986) ("[we need not consider what standards would apply] if the plaintiff sues a non-media defendant." In its first paragraph, the Colbert court identified one question presented as "whether mere negligence by a media defendant is sufficient to allow recovery for false light invasion of privacy." Colbert, 747 P.2d at 287 (emphasis added). However, under the facts of this case, the Court need not resolve the issue